## SOUTH CAROLINA *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 10.  Argued April 11, 1905.—Decided December 4, 1905.

Persons who sell liquor are not relieved from liability for the internal revenue tax imposed by the Federal Government by the fact that they have no interest in the profits of the business and are simply the agents of a State which, in the exercise of its sovereign power, has taken charge of the business of selling intoxicating liquor. They are persons within the meaning of sections 3140, 3232 and 3244 Rev. Stat.

The National Government is one of enumerated powers, and a power enumerated and delegated by the Constitution to Congress is comprehensive and complete, without other limitations than those found in the Constitution itself.

To preserve the even balance between the National and state governments and hold each in its separate sphere is the duty of all courts, and pre-eminently of this court.

The Constitution is a written instrument, and, as such, its meaning does not alter. Its language, as a grant of power to the National Government, is general and, as changes come in social and political life, it embraces all new conditions within the scope of the powers conferred.

In interpreting the Constitution recourse must be had to the common law, and also to the position of the framers of the instrument, and what they

must have understood to be the meaning and scope of the grants of power contained therein must be considered.

That which is implied is as much a part of the Constitution as that which is expressed, and amongst the implied matters is that the ·Nation may not prevent a State from discharging the ordinary functions of govern-, ment, and no State can interfere with the National Government in the free exercise of the powers conferred upon it.

The framers of the Constitution in granting to the National Government full power over license taxes intended that the power should be complete and not to be destroyed by the States extending their functions in a manner not then contemplated.

A State may control the sale of liquor by the dispensary system adopted in South Carolina, but when it does so it engages in ordinary private business which is not, by the mere fact that it is being conducted by a State, exempted from the operation of the taxing power of the National Government.

The internal revenue tax on the sale of liquor is not a tax on property or profits of a business but a charge on the business irrespective of the property used therein, or the profits realized therefrom.

The exemption of state agencies and instrumentalities from National taxation is limited to those which are of a strictly governmental character, and does not extend to those used by the State in carrying on an ordinary private business.

By several statutes, the State of South Carolina established dispensaries for the wholesale and retail sale of liquor, and prohibited sale by other than the dispensers. The United States demanded the license taxes prescribed by the internal revenue act for dealers in intoxicating liquors, and the dispensers filed the statutory applications for such licenses. The State, sometimes in cash and sometimes by warrant on its treasury, paid the taxes. No protest was made in reference to these payments prior to April 14, 1901. On that day a formal protest by the state dispensary commissioner was filed with the United States collector of internal revenue at Columbia, South Carolina. No appeal or application for the repayment of the sums paid by the various dispensers was made by them or by the State of South Carolina to the Commissioner of Internal Revenue, as authorized by sections 3226, 3227 and 3228 Rev. Stat.

The dispensers had no interest in the sales and received no

profit therefrom.    The entire profits were appropriated by the
State, one-half being divided equally between the municipality
and the county in which the dispensaries were located, and the
other half paid into the state treasury.    In the year 1901 the
profits arising from these sales amounted to $545,248.12.
While the laws of South Carolina prohibited the sale of liquor
by individuals other than the dispensers, of 373 special license
stamps issued in that State by the United States internal
revenue collector, only 112 were to dispensers, while 260 were
to private individuals.    Three separate actions were com-
menced in the Court of Claims by the State of South Carolina
to recover the amounts paid for these license taxes.    These
actions were consolidated.    Upon a hearing findings of fact
were made and a judgment entered for the United States.
39 Court of Claims Reports, 257.[1]    Whereupon the State ap-
pealed to this court.

---

[1] The points decided by the Court of Claims, as stated in the syllabus of
the opinion delivered by the Chief Justice of that court, are as follows:
I. The buying and selling of alcoholic liquors for a profit stamps upon
the South Carolina dispensary system a commercial character in
addition to that of a police regulation.
II. The framers of the Constitution had before them three purposes:
The construction of a new National Government; the establish-
ment of a dual system of government with the distribution of powers
between the General or National Government and the local or state
Governments; the placing of certain immutable restrictions upon
the powers of government to secure the individual rights of the
citizen.    They attempted no restrictive legislation, but left the
people of the United States free to make their own laws.
III. The national authority to "*lay and collect taxes, duties, imposts, and
excises*" is expressly given; the police power, whether of the Na-
tional or state Governments, is neither given nor restricted by the
Constitution.
IV. The police power is the power to impose those restraints upon private
rights which are necessary for the general welfare.    It is a power
inherent in all governments, needing neither grant nor recognition
by the Constitution.
V. The general welfare is one thing; exemption from taxation is another.
If a State unites in one undertaking an exercise of the police power
with a commercial business, the National Government can not be
compelled to aid the operation of the police power by foregoing

*Mr. Jackson H. Ralston,* with whom *Mr. Franklin H. Mackey* (now deceased) and *Mr. Frederick L. Siddons* were on the brief, for appellant:

. The provisions of sections 3232 and 3244 of the Revised Statutes apply to "persons" and not to a State of the Federal Union or its instrumentalities of government.

The attorneys general have so held.  12 Op. 176, 277, 376, 402; 13 Op. 67, 439.  Also the courts.  *Georgia* v. *Atkins,* 35 Georgia, 315; *United States* v. *B. & O. R. R. Co.,* 17 Wall. 322; *Van Brocklin* v. *Tennessee,* 117 U. S. 151; *Collector* v. *Day,* 11 Wall. 113; *Dobbins* v. *Erie County,* 16 Pet. 435; *United States* v. *Louisville,* 169 U. S. 249.

It is true that for the purpose of effectuating justice and sustaining the jurisdiction of courts, States have been held to be persons.  *Honduras* v. *Soto,* 112 N. Y. 310; *Martin* v. *State,* 24 Texas, 61, but this is not the ordinary or legal interpretation of the word.  *United States* v. *Fox,* 94 U. S. 315; *McBride* v. *Reice County,* 44 Fed. Rep. 17.  *Salt Lake City* v. *Hollister,* 118 U. S. 256, distinguished, see *Manufacturing Co.* v. *Improvement Co.,* 25 Washington, 667.  In the congressional definition given by Congress in the act of 1877 to the word "Person," States were not included.

The Constitution contains no grant of power to Congress, express or implied, to tax a State or its means and instrumentalities of government; and the exercise by Congress of a power not expressly or impliedly granted by the Constitution to it is impliedly forbidden.  Cooley's Const. Lim.  § 480;

---

its constitutional right to lay and collect an impost or excise on the business part of the transaction.

VI. The Constitution contains no grant of power, express or implied, which authorizes the General Government to tax a State through its means and instrumentalities of government; but an excise on the dealer is a tax upon the consumer; and the exemption of the State from taxation extends no further than the functions belonging to a State in its ordinary capacity.

VII. The principle which rules and guides in such cases is this: The exemption of sovereignty extends no further than the attributes of sovereignty.

*McCulloch* v. *Maryland*, 4 Wheat. 316, 432; *Income Tax Case*, 157 U. S. 429.

State property and state instrumentalities in the administration of its government cannot be taxed, directly or indirectly, by the Federal Government. *Warren* v. *Paul*, 22 Indiana, 276; *State* v. *Gaston*, 32 Indiana, 1; *Jones* v. *Keep*, 19 Wisconsin, 390; *Sayler* v. *Davis*, 22 Wisconsin, 225; *Union Bank* v. *Hill*, 3 Coldw. (Tenn.) 325; *Smith* v. *Short*, 40 Alabama, 385; *Freedman* v. *Sigel*, 10 Blatchf. C. C. 327.

"The power to tax includes the power to destroy;" therefore the police power, like the judicial power of a State, may be destroyed by Congress under the guise of taxation, if the right to tax it exists at all. If Congress can tax the instrumentalities chosen by the State to carry out its police power, then, under the plea of the right to tax, it may tax the dispensary agents so heavily as to tax them out of existence as it did the state banks. *Fifield* v. *Close*, 15 Michigan, 505.

The Internal Revenue Office, even while demanding this tax, has from time to time passed on this constitutional question of the limitation upon the taxing power of the United States over state instrumentalities, and has invariably conceded the principle now contended for. See Int. Rev. Rec., 145, 1870.

The United States holds the money collected from the dispensaries to the use of the State and must refund it.

This money has been paid by the revenue collector into the United States Treasury. To whom does it belong? The answer, of course, is that it is *ex æquo et bono* the money of the State of South Carolina. The United States holds it in good conscience to the use of the State. *Johnson's Case*, 17 C. Cl. 157; *Devlin's Case*, 12 C. Cl. 266; *United States* v. *Bank*, 96 U. S. 30.

In the case at bar it was obtained by an honest mistake. Fraud, accident, and *mistake* are alike equitable grounds of relief. Money paid under a mistake of law and not of fact by private parties cannot generally be recovered, but that

doctrine does not apply to a State. *Barnes* v. *District of Columbia*, 22 C. Cl. 366, 394; *Wisconsin R. R.* v. *United States*, 164 U. S. 190.

The money in the case at bar has been unlawfully obtained from the State by mistake of all the parties. No appeal to the Internal Revenue Commissioner is necessary—this is not a "revenue case." Sections 3226, 3227 and 3228 Rev. Stat., do not apply to a State. To appeal to the Commissioner would be a surrender by the State of the very point in controversy. *Fassett's Case*, 142 U. S. 479, 487; *De Lima* v. *Bidwell*, 182 U. S. 1, 178, which modifies or distinguishes *Nichols* v. *United States*, 7 Wall. 122; see also *Boughton's Case*, 12 C. Cl. 330.

The money was paid without authority of the State which, is not bound by the unauthorized act of the agent. Such is the case as to the United States. *Wis. Cent. R. R. Co.* v. *United States*, 164 U. S. 440, and the same doctrine applies to a State, especially when the recipient is the United States.

Money paid under mistake of law as this was may be recovered in this court even when a private party is the claimant, and, *a fortiori*, when a State, which can act only by its agents, is the claimant, and the Court of Claims has jurisdiction under the Tucker act. *Snell* v. *Insurance Co.*, 98 U. S. 85, 90; *United States* v. *Bank*, 96 U. S. 30.

The dispensary law is constitutional and is a legitimate exercise by the State of its police power. *Crowley* v. *Christensen*, 137 U. S. 90; *George* v. *Aiken*, 42 So. Car. 222.

The dispensary system comes well within the police powers of the State, for if a State may take a perfectly worthless piece of paper and, by stamping certain arrangements of words and figures upon it, sell that paper as a license to an individual to carry on the liquor business, making thereby a direct profit, it does no act differing in any degree in principle if, instead of selling such paper privilege, it sells the liquor itself. In either event, the prime object is to control within certain fixed limits the traffic in an article, the excessive use of which is confessedly

an evil, and it may not be said that because under one system or the other a profit arises to the State, therefore the police powers of the State are being improperly exercised for commercial ends. *License Cases,* 5 How. 583; *Vance* v. *Vandercook Co.,* 170 U. S. 444.

The statute must be construed as it stands. If Congress intended to subject States to the tax it is a case of *casus omissus* and the court cannot supply the lacking words. *Denn* v. *Reid,* 10 Pet. 527; *Bate Co.* v. *Sulzberger,* 157 U. S. 57; *Lake County* v. *Rollins,* 130 U. S. 662.

*The Solicitor General* for the United States:

The State is fairly covered by the language of the law. A municipal corporation, a State, a foreign State and the United States may be included by the word "person" or "corporation" in a statute; regarding a State as possessing a corporate and municipal side as well as a sovereign character. *Martin* v. *State,* 24 Texas, 61; *Indiana* v. *Woram,* 6 Hill (N. Y.), 33; *Lancaster Co.* v. *Trimble,* 34 Nebraska, 752; *Kansas* v. *Herold,* 9 Kansas, 194; *Republic of Honduras* v. *Soto,* 112 N. Y. 310; *Salt Lake City* v. *Hollister,* 118 U. S. 256. Opinions of the Attorneys General to the contrary have either been overruled or are distinguishable, as they relate to attempts to tax the property or legitimate governmental instrumentalities of a State. 12 Op. 176, 277, 376, 402; 13 Op. 67, 439; *National Bank* v. *United States,* 101 U. S. 1. The principle of exemption from the Federal taxing power on this ground has been frequently stated. *Income Tax Cases,* 157 U. S. 429, 584; *United States* v. *B. & O. R. R.,* 17 Wall. 322. In the latter case, describing objects beyond the taxing power of Congress, the language is,—"all necessary agencies for legitimate purposes of state government." This case is outside the rule; the business taxed is not such an agency. In state liquor licenses the documentary license required by state laws is exempt from Federal taxation, but the business is not. Former internal revenue rulings to the contrary have related to laws like those of Maine,

Massachusetts and Vermont, which were a real measure of pro-
hibition and only permitted sales for limited purposes, medici-
nal and industrial. For that reason the State's agents were
relieved of the special tax. This is not a tax on persons or
property at all, but an excise resting on the sale of the goods
and paid in the last analysis by the consumer. It is a tax on
the business; it is merely an expense of that business. There
is no burden on the State or its property. The taxation is
indirect and is valid as a mere excise on the transaction of a
business. *Pacific Ins. Co. v. Soule*, 7 Wall, 433; *Veazie Bank
v. Fenno*, 8 Wall. 533; *Scholey v. Rew*, 23 Wall. 331; *Nicol v.
Ames*, 173 U. S. 509; *Knowlton v. Moore*, 178 U. S. 41; *Patton
v. Brady*, 184 U. S. 608; *Spreckels Refining Co. v. McClain*,
192 U. S. 397.

The excise is levied pursuant to express constitutional grant
of power. The reserved police power of the States cannot
control the powers created or prohibitions imposed by the
Constitution. The Federal taxing power is broad and un-
trammeled. It runs concurrently with the state taxing power
when they affect the same objects. A liquor excise is about
the most familiar example of its operation and scope. *McCul-
loch v. Maryland*, 4 Wheat. 316; *Gibbons v. Ogden*, 9 Wheat.
1; *License Tax Cases*, 5 Wall. 462; *Austin v. Alderman*, 7 Wall.
694; *Knowlton v. Moore*, 178 U. S. 41; *The Oleomargarine Cases*,
195 U. S. 27. State police power is subordinate to Federal
power under the Constitution. *Bowman v. Chicago & North-
western R. Co.*, 125 U. S. 465, 507; *Railroad Co. v. Husen*, 95
U. S. 465, 473. This rule applies to interstate commerce in
liquor, *Walling v. Michigan*, 116 U. S. 446; *Leisy v. Hardin*,
135 U. S. 100; *Lyng v. Michigan*, 135 U. S. 161, although
permissive legislation of Congress now recognizes a larger
state control than formerly. *In re Rahrer*, 140 U. S. 545;
*Rhodes v. Iowa*, 170 U. S. 412; *Vance v. Vandercook Co.*, 170
U. S. 438; *American Express Co. v. Iowa*, 196 U. S. 133. But
in the absence of such permissive legislation the States may
not, under their police power, interfere with interstate com-

merce. The principle of the absoluteness of a power or right under the Constitution is illustrated by its prohibitions. States cannot impair their contracts, and the assertion of the police power must yield to this prohibition. *Bridge Proprietors* v. *Hoboken Co.,* 1 Wall. 116; *The Binghamton Bridge,* 3 Wall. 51; *Asylum* v. *Home of the Friendless,* 8 Wall. 430; *Humphrey* v. *Pegues,* 16 Wall. 244, 248, 249; *Farrington* v. *Tennessee,* 95 U. S. 679, 689; *Asylum* v. *New Orleans,* 105 U. S. 362, 368. State statutes are unconstitutional whenever they conflict by their necessary operation and effect, with the paramount authority of Congress. *Henderson* v. *Mayor,* 92 U. S. 259; *Chy Lung* v. *Freeman,* 92 U. S. 275. Although the police power is from its nature incapable of exact definition or limitation, *Slaughter-house Cases,* 16 Wall. 36; *Stone* v. *Mississippi,* 101 U. S. 814, 818, all definitions must "be taken subject to the condition that the State cannot, in its exercise for any purpose whatever, encroach upon the powers of the general Government or rights granted or secured by the supreme law of the land. A municipal agency of the State is subject to Federal taxation, although the effect of that tax may be destructive. *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650. The bank tax cases control the present case. *Veazie Bank* v. *Fenno,* 8 Wall. 533; *National Bank* v. *United States,* 101 U. S. 1.

The dispensary system is not a valid exercise of the police power, and the State has deliberately embarked in a commercial enterprise for the sole object of profit. The consequences of construction are not conclusive, yet are often worthy of notice. *United States* v. *Edmonston,* 181 U. S. 500. If the State's contentions are well founded, she may assume entire control of the manufacture and sale of liquors and tobacco without paying taxes; she may import free liquors and drugs and cloths; she may engage in any business whatever, under the police claim, on just as good grounds, and claim to be free of all Federal taxation. If some States chose to follow the lead of Australia or New Zealand, on the theory of the government

ownership of land and leases to occupants in place of private ownership and title, the right of direct taxation also by the United States would fall before its claim. If one State could pursue these theories, all States could, and the result would be that the Federal power of taxation, both direct and indirect, would be destroyed.

A State is the sole and absolute judge whether the liquor traffic is inherently injurious to the health, morals and welfare of its people. The State, if of opinion that liquors are injurious, may prohibit their sale as a beverage absolutely, or may restrict and regulate under high license. It cannot, however, under the pretense of remedying evils, forbid citizens to engage in the business and then turn it into a government monopoly. This law is entirely unlike those which, declaring that the sale and consumption of liquor are harmful, permit sale in a limited way only for medicinal and mechanical purposes, but prohibit sale as a beverage to everyone. The South Carolina law is not the exercise of legitimate power of police reserved to the States. *Mugler* v. *Kansas*, 123 U. S. 623, 661; *Minnesota* v. *Barber*, 136 U. S. 313; *Brimmer* v. *Rebman*, 138 U. S. 78; *Voight* v. *Wright*, 141 U. S. 62; *Booth* v. *Illinois*, 184 U. S. 425, 429.

Is the trade incident to the police regulation, or the police regulation incident to the trade? Examination of the South Carolina statutes of 1892 and 1893, with their later amendments, and consideration of the messages of her governors from 1892 on, with other public state documents, show clearly that the dispensary system does not purport to be a police regulation of the liquor traffic, but merely a scheme whereby the State realizes the profits of the business instead of private individuals. The net profits in one year were over $500,000.

When a State enters into business as a corporator, it lays down its sovereignty so far. *Bank of United States* v. *Planters' Bank*, 9 Wheat. 904; *Bank of Kentucky* v. *Wister*, 2 Pet. 318; *Briscoe* v. *Bank of Kentucky*, 11 Pet. 323; *Railroad Co.* v. *Letson*, 2 How. 551; *Curran* v. *Arkansas*, 15 How. 308. This

principle applies, however the state's business may be conducted, whether as member of a partnership or of a corporation or, as here, by the State acting alone and exercising an exclusive monopoly. The State chooses to step down from its sovereignty and must take the consequences. When the United States avails of the law merchant, it is bound by the rules of that law, notwithstanding its sovereignty. *United States* v. *Bank of Metropolis*, 15 Pet. 377, 392; *United States* v. *State Bank*, 96 U. S. 30, 36.

If a State embarks in the liquor business, it does so with the same consequences and subject to the same liabilities under the law as a private individual or an ordinary corporation; the internal revenue taxes collected from the South Carolina dispensary system were therefore properly exacted.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

The important question in this case is, whether persons who are selling liquor are relieved from liability for the internal revenue tax by the fact that they have no interest in the profits of the business and are simply the agents of a State which, in the exercise of its sovereign power, has taken charge of the business of selling intoxicating liquors. It is true a further question is made whether the act of Congress is broad enough to include such persons. But upon this we have little doubt. Section 3232 Rev. Stat provides:

"No person shall be engaged in nor carry on any trade or business hereinafter mentioned until he has paid a special tax therefor in the manner hereinafter provided."

Section 3244, contains these words of description:

"Every person who sells, or offers for sale foreign or domestic distilled spirits or wines, in less quantities than five wine gallons at the same time, shall be regarded as a retail dealer in liquors."

"Person" is also defined:

"Sec. 3140. . . . Where not otherwise distinctly expressed or manifestly incompatible with the intent thereof, the word 'person,' as used in this title, shall be construed to mean and include a partnership, association, company, or corporation, as well as a natural person."

Now, the dispensers were persons who sold liquors. They applied for and received the licenses. True they were acting simply as agents of the State, but if the fact that the State was the principal creates no exemption from Federal taxation then the statute reaches them because they were the actual sellers.

We pass, therefore, to the vital question in the case, and it is one of far-reaching significance. We have in this Republic a dual system of government, National and state, each operating within the same territory and upon the same persons; and yet working without collision, because their functions are different. There are certain matters over which the National Government has absolute control and no action of the State can interfere therewith, and there are others in which the State is supreme, and in respect to them the National Government is powerless. To preserve the even balance between these two governments and hold each in its separate sphere is the peculiar duty of all courts, preëminently of this—a duty oftentimes of great delicacy and difficulty.

Two propositions in our constitutional jurisprudence are no longer debatable. One is that the National Government is one of enumerated powers, and the other that a power enumerated and delegated by the Constitution to Congress is comprehensive and complete, without other limitations than those found in the Constitution itself.

The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted it means now. Being a grant of powers to a government its language is general, and as changes come in social and political life it embraces in its grasp all new conditions which are within the scope of the powers in terms conferred. In other words,

while the powers granted do not change, they apply from generation to generation to all things to which they are in their nature applicable. This in no manner abridges the fact of its changeless nature and meaning. Those things which are within its grants of power, as those grants were understood when made, are still within them, and those things not within them remain still excluded. As said by Mr. Chief Justice Taney in *Dred Scott* v. *Sandford*, 19 How. 393, 426:

"It is not only the same in words, but the same in meaning, and delegates the same powers to the Government, and reserves and secures the same rights and privileges to the citizens; and as long as it continues to exist in its present form, it speaks not only in the same words, but with the same meaning and intent with which it spoke when it came from the hands of its framers, and was voted on and adopted by the people of the United States. Any other rule of construction would abrogate the judicial character of this court, and make it the mere reflex of the popular opinion or passion of the day."

It must also be remembered that the framers of the Constitution were not mere visionaries, toying with speculations or theories, but practical men, dealing with the facts of political life as they understood them, putting into form the government they were creating, and prescribing in language clear and intelligible the powers that government was to take. Mr. Chief Justice Marshall, in *Gibbons* v. *Ogden*, 9 Wheat. 1, 188, well declared:

"As men whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our Constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said."

One other fact must be borne in mind, and that is that in interpreting the Constitution we must have recourse to the common law. As said by Mr. Justice Matthews in *Smith* v. *Alabama*, 124 U. S. 465, 478:

"The interpretation of the Constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history."

And by Mr. Justice Gray in *United States* v. *Wong Kim Ark,* 169 U. S. 649, 654:

"In this, as in other respects, it must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the Constitution. *Minor* v. *Happersett*, 21 Wall. 162; *Ex parte Wilson*, 114 U. S. 417, 422; *Boyd* v. *United States*, 116 U. S. 616, 624, 625; *Smith* v. *Alabama*, 124 U. S. 465. The language of the Constitution, as has been well said, could not be understood without reference to the common law. 1 Kent Com. 336; Bradley, J., in *Moore* v. *United States*, 91 U. S. 270, 274."

To determine the extent of the grants of power we must, therefore, place ourselves in the position of the men who framed and adopted the Constitution, and inquire what they must have understood to be the meaning and scope of those grants.

By the first clause of section 8 of Article I of the Constitution, Congress is given the "power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States."

By this clause the grant is limited in two ways: The revenue must be collected for public purposes, and all duties, imposts and excises must be uniform throughout the United States.

The fourth, fifth and sixth clauses of section 9 of Article I are:

"4. No capitation, or other direct, tax shall be laid, unless in proportion to the census or enumeration herein before directed to be taken.

"5. No tax or duty shall be laid on articles exported from any State.

"6. No preference shall be given by any regulation of com-

merce or revenue to the ports of one State over those of another: nor shall vessels bound to, or from, one State, be obliged to enter, clear, or pay duties in another."

Article V of the Amendments provides that no one shall be deprived of "life, liberty, or property, without due process of law."

These are all the constitutional provisions that bear directly upon the subject. It will be seen that the only qualifications of the absolute, untrammeled power to lay and collect excises are that they shall be for public purposes, and that they shall be uniform throughout the United States. All other limitations named in the Constitution relate to taxes, duties and imposts. If, therefore, we confine our inquiry to the express provisions of the Constitution there is disclosed no limitation on the power of the General Government to collect license taxes.

But it is undoubtedly true that that which is implied is as much a part of the Constitution as that which is expressed. As said by Mr. Justice Miller in *Ex parte Yarbrough*, 110 U. S. 651, 658:

"The proposition that it has no such power is supported by the old argument often heard, often repeated, and in this court never assented to, that when a question of the power of Congress arises the advocate of the power must be able to place his finger on words which expressly grant it. The brief of counsel before us, though directed to the authority of that body to pass criminal laws, uses the same language. Because there is no *express* power to provide for preventing violence exercised on the voter as a means of controlling his vote, no such law can be enacted. It destroys at one blow, in construing the Constitution of the United States, the doctrine universally applied to all instruments of writing, that what is implied is as much a part of the instrument as what is expressed."

Among those matters which are implied, though not expressed, is that the Nation may not, in the exercise of its powers, prevent a State from discharging the ordinary functions of government, just as it follows from the second clause of Arti-

cle VI of the Constitution, that no State can interfere with the free and unembarrassed exercise by the National Government of all the powers conferred upon it.

"This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding."

In other words, the two governments, National and state, are each to exercise their power so as not to interfere with the free and full exercise by the other of its powers. This proposition, so far as the Nation is concerned, was affirmed at an early day in the great case of *M'Culloch* v. *Maryland,* 4 Wheat. 316, in which it was held that the State had no power to pass a law imposing a tax upon the operations of a national bank. The case is familiar and needs not to be quoted from. No answer has ever been made to the argument of Mr. Chief Justice Marshall, and the propositions there laid down have become fundamental in our constitutional jurisprudence. *Osborn* v. *Bank of United States,* 9 Wheat. 738; *Weston* v. *City Council of Charleston,* 2 Pet. 449; *Bank of Commerce* v. *New York,* 2 Black, 620; *Bank Tax Case,* 2 Wall. 200; *The Banks* v. *The Mayor,* 7 Wall. 16.

The limitations on the powers of the States to tax national banks are founded upon the doctrines laid down in that case. So also the immunity of national property from state taxation. It is true that in most of the enabling acts for the admission of new States there is express provision that the property of the Nation shall be free from state taxation, but as shown by Mr. Justice Gray, delivering the opinion of the court in *Van Brocklin* v. *Tennessee,* 117 U. S. 151, this provision is merely declaratory and unnecessary to establish the exemption of national property from state taxation. See also *Dobbins* v. *Commissioners of Erie County,* 16 Pet. 435, as to taxation by a State of an officer of the United States for his office or its emoluments.

The converse of this proposition has also been declared by the decisions of this court. In *Texas* v. *White*, 7 Wall. 700, 725, Mr Chief Justice Chase, speaking for the court, declared:

"Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National Government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States."

In *The Collector* v. *Day*, 11 Wall. 113, it was held that it was not competent for Congress to impose a tax upon the salary of a judicial officer of a State. In the opinion of the court, delivered by Mr. Justice Nelson, it was said (p. 127):

"It is admitted that there is no express provision in the Constitution that prohibits the General Government from taxing the means and instrumentalities of the States, nor is there any prohibiting the States from taxing the means and instrumentalities of that Government. In both cases the exemption rests upon necessary implication, and is upheld by the great law of self-preservation; as any government, whose means employed in conducting its operations, if subject to the control of another and distinct government, can exist only at the mercy of that government. Of what avail are these means if another power may tax them at discretion?"

See also *United States* v. *Railroad Company*, 17 Wall. 322; *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, 584.

Upon this proposition counsel for plaintiff in error rely. There being no constitutional limit as to the amount of a license tax, and the power to tax being the power to destroy, if Congress can enforce such a tax against a State it may destroy this effort of the State in the exercise of its police power to control the sale of liquor. It cannot be doubted that the regulation of the sale of liquor comes within the scope of the

police power, and equally true that the police power is in its fullest and broadest sense reserved to the States; that the mode of exercising that power is left to their discretion, and is not subject to National supervision. But if Congress may tax the agents of the State charged with the duty of selling intoxicating liquors, it in effect assumes a certain control over this police power, and thus may embarrass and even thwart the attempt of the State to carry on this mode of regulation.

We are not insensible to the force of this argument, and appreciate the difficulties which it presents, but let us see to what it leads. "Each State is subject only to the limitations prescribed by the Constitution and within its own territory is otherwise supreme. Its internal affairs are matters of its own discretion. The Constitution provides that "the United States shall guarantee to every State in this Union a republican form of government." Art. IV, sec. 4. That expresses the full limit of National control over the internal affairs of a State.

The right of South Carolina to control the sale of liquor by the dispensary system has been sustained. *Vance* v. *W. A. Vandercook Co., No. 1,* 170 U. S. 438. The profits from the business in the year 1901, as appears from the findings of fact, were over half a million of dollars. Mingling the thought of profit with the necessity of regulation may induce the State to take possession, in like manner, of tobacco, oleomargarine, and all other objects of internal revenue tax. If one State finds it thus profitable other States may follow, and the whole body of internal revenue tax be thus stricken down.

More than this. There is a large and growing movement in the country in favor of the acquisition and management by the public of what are termed public utilities, including not merely therein the supply of gas and water, but also the entire railroad system. Would the State by taking into possession these public utilities lose its republican form of government?

We may go even a step further. There are some insisting that the State shall become the owner of all property and the manager of all business. Of course, this is an extreme view,

but its advocates are earnestly contending that thereby the best interests of all citizens will be subserved. If this change should be made in any State, how much would that State contribute to the revenue of the Nation? If this extreme action is not to be counted among the probabilities, consider the result of one much less so. Suppose a State assumes under its police power the control of all those matters subject to the internal revenue tax and also engages in the business of importing all foreign goods. The same argument which would exempt the sale by a State of liquor, tobacco, etc., from a license tax would exempt the importation of merchandise by a State from import duty. While the State might not prohibit importations, as it can the sale of liquor, by private individuals, yet paying no import duty it could undersell all individuals and so monopolize the importation and sale of foreign goods.

Obviously, if the power of the State is carried to the extent suggested, and with it is relief from all Federal taxation, the National Government would be largely crippled in its revenues. Indeed, if all the States should concur in exercising their powers to the full extent, it would be almost impossible for the Nation to collect any revenues. In other words, in this indirect way it would be within the competency of the States to practically destroy the efficiency of the National Government. If it be said that the States can be trusted not to resort to any such extreme measures, because of the resulting interference with the efficiency of the National Government, we may turn to the opinion of Mr. Chief Justice Marshall in *M'Culloch* v. *Maryland, supra* (p. 431), for a complete answer:

"But is this a case of confidence? Would the people of any one State trust those of another with a power to control the most insignificant operations of their state government? We know they would not. Why, then, should we suppose that the people of any one State should be willing to trust those of another with the power to control the operations of a government to which they have confided their most important and

most valuable interests? In the legislature of the Union alone, are all represented. The legislature of the Union alone, therefore, can be trusted by the people with the power of controlling measures which concern all, in the confidence that it will not be abused."

In other words, we are to find in the Constitution itself the full protection to the Nation, and not to rest its sufficiency on either the generosity or the neglect of any State.

There is something of a conflict between the full power of the Nation in respect to taxation and the exemption of the State from Federal taxation in respect to its property and a discharge of all its functions. Where and how shall the line between them be drawn? We have seen that the full power of collecting license taxes is in terms granted to the National Government with only the limitations of uniformity and the public benefit. The exemption of the State's property and its functions from Federal taxation is implied from the dual character of our Federal system and the necessity of preserving the State in all its efficiency. In order to determine to what extent that implication will go we must turn to the condition of things at the time the Constitution was framed. What, in the light of that condition, did the framers of the convention intend should be exempt? Certain is it that modern notions as to the extent to which the functions of a State may be carried had then no hold. Whatever Utopian theories may have been presented by any writers were regarded as mere creations of fancy, and had no practical recognition. It is true that monopolies in respect to certain commodities were known to have been granted by absolute monarchs, but they were not regarded as consistent with Anglo-Saxon ideas of government. The opposition to the Constitution came not from any apprehension of danger from the extent of power reserved to the States, but, on the other hand, entirely through fear of what might result from the exercise of the powers granted to the central government. While many believed that the liberty of the people depended on the preservation of the rights

of the States, they had no thought that those States would extend their functions beyond their then recognized scope, or so as to imperil the life of the Nation.   As well said by Chief Justice Nott, delivering the opinion of the Court of Claims in this case (39 C. Cl. 284):

"Moreover, at the time of the adoption of the Constitution there probably was not one person in the country who seriously contemplated the possibility of government, whether State or National, ever descending from its primitive plant of a body politic to take up the work of the individual or body corporate.   The public suspicion associated government with patents of nobility, with an established church, with standing armies, and distrusted all governments.   Even in the high intelligence of the convention there were men who trembled at the power given to the President, who trembled at the power which the Senate might usurp, who feared that the life tenure of the judiciary might imperil the liberties of the people. Certain it is that if the possibility of a government usurping the ordinary business of individuals, driving them out of the market, and maintaining place and power by means of what would have been called, in the heated invective of the time, 'a legion of mercenaries,' had been in the public mind, the Constitution would not have been adopted, or an inhibition of such power would have been placed among Madison's Amendments."

Looking, therefore, at the Constitution in the light of the conditions surrounding at the time of its adoption, it is obvious that the framers in granting full power over license taxes to the National Government meant that that power should be complete, and never thought that the States by extending their functions could practically destroy it.

If we look upon the Constitution in the light of the common law we are led to the same conclusion.   All the avenues of trade were open to the individual.   The Government did not attempt to exclude him from any.   Whatever restraints were put upon him were mere police regulations to control his conduct in the

business and not to exclude him therefrom. The Government was no competitor, nor did it assume to carry on any business which ordinarily is carried on by individuals. Indeed, every attempt at monopoly was odious in the eyes of the common law, and it mattered not how that monopoly arose, whether from grant of the sovereign or otherwise. The framers of the Constitution were not anticipating that a State would attempt to monopolize any business heretofore carried on by individuals.

Further, it may be noticed that the tax is not imposed on any property belonging to the State, but is a charge on a business before any profits are realized therefrom. In this it is not unlike the taxes sustained in *United States* v. *Perkins*, 163 U. S. 625, and *Snyder* v. *Bettman*, 190 U. S. 249. In the former case a succession tax of the State of New York was sustained, although the property charged therewith was bequeathed by will to the United States, the court holding that the latter acquired no property until after the state charges for transmission had been paid, saying (p. 629):

"'This, therefore, is not a tax upon the property itself, but is merely the price exacted by the State for the privilege accorded in permitting property so situated to be transferred by will or by descent or distribution.'"

In *Snyder* v. *Bettman*, the succession tax required by the laws of Congress was sustained, although the bequest was to the city of Springfield, Ohio. This is almost a converse to the *Perkins case*. It was held that while the power to regulate inheritances and testamentary dispositions was one belonging to the State, and therefore subject to such conditions as the State might see fit to impose (as held in the *Perkins case*), yet the power to impose a succession tax was vested in Congress, that it could be exercised upon a bequest made to a municipality or a State, and was not to be considered as a tax upon the property bequeathed, the court saying (p. 254):

"Having determined, then, that Congress has the power to tax successions; that the States have the same power, and that such power extends to bequests to the United States, it would

seem to follow logically that Congress has the same power to tax the transmission of property by legacy to States, or their municipalities, and that the exercise of that power in neither case conflicts with the proposition that neither the Federal nor the state government can tax the property or agencies of the other, since, as repeatedly held, the taxes imposed are not upon property, but upon the right to succeed to property."

So here the charge is not upon the property of the State, but upon the means by which that property is acquired, and before it is acquired.

It is also worthy of remark that the cases in which the invalidity of a Federal tax has been affirmed were those in which the tax was attempted to be levied upon property belonging to the State, or one of its municipalities, or was a charge upon the means and instrumentalities employed by the State, in the discharge of its ordinary functions as a government.

In *Veazie Bank* v. *Fenno*, 8 Wall. 533, in which a National tax of ten per cent on the amount of notes of any person, state bank, or banking association, used for circulation, was sustained, the court thus stated the limits of the power of National taxation over state agencies (p. 547):

"It may be admitted that the reserved rights of the States, such as the right to pass laws, to give effect to laws through executive action, to administer justice through the courts, and to employ all necessary agencies for legitimate purposes of state government, are not proper subjects of the taxing power of Congress."

In *The Collector* v. *Day*, 11 Wall. 113, cited *supra*, in the argument in favor of the exemption of the salary of a state judge from National taxation, is this language (p. 125) ·

"It would seem to follow, as a reasonable, if not a necessary consequence, that the means and instrumentalities employed for carrying on the operations of their governments, for preserving their existence, and fulfilling the high and responsible duties assigned to them in the Constitution, should be left free and unimpaired, should not be liable to be crippled, much less

defeated by the taxing power of another government, which power acknowledges no limits but the will of the legislative body imposing the tax. And, more especially, those means and instrumentalities which are the creation of their sovereign and reserved rights, one of which is the establishment of the judicial department, and the appointment of officers to administer their laws. Without this power, and the exercise of it, we risk nothing in saying that no one of the States under the form of government guaranteed by the Constitution could long preserve its existence."

In *United States* v. *Railroad Company*, 17 Wall. 322, an attempt was made to collect a tax on money due from a railroad company to the city of Baltimore. It was held that the city was a portion of the State in the exercise of a limited portion of the powers of the State, and the court said (p. 327):

"The right of the States to administer their own affairs through their legislative, executive, and judicial departments, in their own manner through their own agencies, is conceded by the uniform decisions of this court and by the practice of the Federal Government from its organization. This carries with it an exemption of those agencies and instruments from the taxing power of the Federal Government."

And again (p. 332):

"We admit the proposition of the counsel that the revenue must be municipal in its nature to entitle it to the exemption claimed. Thus, if an individual should make the city of Baltimore his agent and trustee to receive funds, and to distribute them in aid of science, literature, or the fine arts, or even for the relief of the destitute and infirm, it is quite possible that such revenues would be subject to taxation. The corporation would therein depart from its municipal character, and assume the position of a private trustee. It would occupy a place which an individual could occupy with equal propriety. It would not in that action be an auxiliary or servant of the State, but of the individual creating the trust. There is nothing of a governmental character in such a position."

In *Ambrosini* v. *United States*, 187 U. S. 1, in which the Federal war revenue tax act, providing for stamp taxes on bonds, was held inapplicable to bonds required from licensees under the dram shop act of Illinois, the court declared (p. 8):

"The question is whether the bonds were taken in the exercise of a function strictly belonging to the State and city in their ordinary governmental capacity, and we are of the opinion that they were, and that they were exempted as no more taxable than the licenses."

These decisions, while not controlling the question before us, indicate that the thought has been that the exemption of state agencies and instrumentalities from National taxation is limited to those which are of a strictly governmental character, and does not extend to those which are used by the State in the carrying on of an ordinary private business.

In this connection may be noticed the well-established distinction between the duties of a public character cast upon municipal corporations and those which relate to what may be considered their private business, and the different responsibility resulting in case of negligence in respect to the discharge of those duties. The Supreme Court of Massachusetts, speaking by Mr. Justice Gray (afterwards an Associate Justice of this court), in *Oliver* v. *Worcester*, 102 Massachusetts, 489, 499, 500, observed:

"The distinction is well established between the responsibilities of towns and cities for acts done in their public capacity, in the discharge of duties imposed upon them by the legislature for the public benefit, and for acts done in what may be called their private character, in the management of property or rights voluntarily held by them for their own immediate profit or advantage as a corporation, although inuring, of course, ultimately to the benefit of the public.

"To render municipal corporations liable to private actions for omission or neglect to perform a corporate duty imposed by general law on all towns and cities alike, and from the per-

formance of which they derive no compensation or benefit in their corporate capacity, an express statute is doubtless necessary. . . ."

"But this rule does not exempt towns and cities from the liability to which other corporations are subject, for negligence in managing or dealing with property or rights held by them for their own advantage or emolument."

In *Lloyd* v. *Mayor &c. of New York,* 5 N. Y. 369, 374, the court said:

"The corporation of the city of New York possesses two kinds of powers, one governmental and public, and, to the extent they are held and exercised, is clothed with sovereignty— the other private, and to the extent they are held and exercised, is a legal individual. The former are given and used for public purposes, the latter for private purposes. While in the exercise of the former, the corporation is a municipal government, and while in the exercise of the latter, is a corporate, legal individual."

See also *Maximilian* v. *Mayor,* 62 N. Y. 160, 164; *Brown* v. *Vinalhaven,* 65 Maine, 402; *Mead* v. *City of New Haven,* 40 Connecticut, 72; *City of Petersburg* v. *Applegarth's Administrator,* 28 Gratt. 321, 343; *Eastman* v. *Meredith,* 36 N. H. 285; *Western Saving Fund Society* v. *City of Philadelphia,* 31 Pa. St. 175. In this case it was held that a city supplying gas to the inhabitants acts as a private corporation, and is subject to the same liabilities and disabilities. In the opinion the court declared (p. 183):

"Such contracts are not made by the municipal corporation, by virtue of its powers of local sovereignty, but in its capacity of a private corporation. The supply of gaslight is no more a duty of sovereignty than the supply of water. Both these objects may be accomplished through the agency of individuals or private corporations, and in very many instances they are accomplished by those means. If this power is granted to a borough or a city, it is a special private franchise, made as well for the private emolument and advantage of the city as for the

public good. The whole investment is the private property of the city, as much so as the lands and houses belonging to it. Blending the two powers in one grant, does not destroy the clear and well-settled distinction, and the process of separation is not rendered impossible by the confusion. In separating them, regard must be had to the object of the legislature in conferring them. If granted for public purposes exclusively, they belong to the corporate body in its public, political, or municipal character. But if the grant was for purposes of private advantage and emolument, though the public may derive a common benefit therefrom, the corporation *quoad hoc* is to be regarded as a private company. It stands on the same footing as would any individual or body of persons, upon whom the like special franchises had been conferred."

See further a subsequent case between the same parties, in the same volume (pp. 185, 189): *Bailey* v. *The Mayor &c.*, 3 Hill, 531; 1 Dillon, Mun. Corp., 4th ed., sec. 66.

Now, if it be well established, as these authorities say, that there is a clear distinction as respects responsibility for negligence between the powers granted to a corporation for governmental purposes and those in aid of private business, a like distinction may be recognized when we are asked to limit the full power of imposing excises granted to the National Government by an implied inability to impede or embarrass a State in the discharge of its functions. It is reasonable to hold that while the former may do nothing by taxation in any form to prevent the full discharge by the latter of its governmental functions, yet whenever a State engages in a business which is of a private nature that business is not withdrawn from the taxing power of the Nation.

For these reasons we think that the license taxes charged by the Federal Government upon persons selling liquor is not invalidated by the fact that they are the agents of the State which has itself engaged in that business.

The judgment of the Court of Claims is

*Affirmed.*

Mr. Justice White, with whom concur Mr. Justice Peckham and Mr. Justice McKenna, dissenting.

The delicacy of the question, the suggestion that, apart from constitutional limitations, the ruling made is, from an economic point of view, a just one, and the long and painstaking consideration which the court has given the case causes me to be reluctant to announce a dissent. This, however, is overborne by the conviction that it is my duty to dissent and state my reasons. And this because the decision now made, as it is by me understood, overrules many cases, departs from a principle which has been recognized from the beginning, and, under the assumed necessity of protecting the taxing power of the Government of the United States, establishes a doctrine which in its potentiality strips the States of their lawful authority. It does more than this, since the theory upon which the case is decided also endows the States with a like power to divest the Government of the United States of its lawful attributes. In other words, by the ruling and the reasoning sustaining it, the ancient landmarks are obliterated and the distinct powers belonging to both the National and state Governments are reciprocally placed the one at the mercy of the other, so as to give to each the potency of destroying the other.

The case is this: South Carolina has adopted a law by which no liquor is allowed to be brought into the State for sale or to be sold therein, except such liquor as may be bought by a board of officers appointed by state authority, which liquor is sold by state agents appointed for that purpose under regulations prescribed by the statute. The question is, whether these agents of the State, for the act of selling liquor belonging to the State, as agents of the State, under the authority of the State, can be subjected to a license for carrying on the liquor business, levied by the internal revenue laws of the United States.

That the State, under its police authority, had the right to absolutely prohibit the sale of liquor, or to subject it to such regulations as it deemed proper, is elementary. So far-reaching

is. that authority that a State may direct the destruction of liquor held contrary to law, without paying the value thereof, and without thereby violating the constitutional safeguards as to the taking of property. *Mugler* v. *Kansas*, 123 U. S. 623. True, by the operation of the commerce clause of the Constitution, the absolute authority of the State does not extend to prohibiting the sale in original packages of liquor brought in from other States. *Leisy* v. *Hardin*, 135 U. S. 100. But that limitation no longer applies, since Congress has, by express legislation, permitted the power of the States to attach to all liquor shipped into one State from another, at once on its arrival, before sale in the original packages, as fully as if it had been manufactured within the State. And the validity of the statute referred to has been upheld by the court in reiterated rulings. *In re Rahrer*, 140 U. S. 545, 562; *Rhodes* v. *Iowa*, 170 U. S. 412; *Vance* v. *W. A. Vandercook Co. No. 1*, 170 U. S. 438; *American Express Co.* v. *Iowa*, 196 U. S. 133; *Adams Express Co.* v. *Iowa*, 196 U. S. 147; *Pabst Brewing Co.* v. *Crenshaw*, 198 U. S. 17. Indeed, one of these cases—the *Vandercook case*—involved the question whether the act of South Carolina, providing for the purchase and sale of liquor belonging to the State, as above stated, was repugnant to the Constitution of the United States, and the validity of the act in this particular was upheld by the court, because of the police power of the State and because of the provisions of the act of Congress limiting the effect of the interstate commerce clause as to liquor as already mentioned.

It is not necessary to trace the want of authority of the United States to impose a license exaction on the agents of the State to an express provision of the Constitution, since the court has constantly held that the absence of authority in the Government of the United States to tax or burden the agencies or instrumentalities of a state government, and the like want of authority on the part of the States to tax the agencies or instrumentalities of the National Government, results from the dual system of government which the Constitution created,

and that the continuance in force of such a prohibition is absolutely essential to the preservation of both governments.

It would be superfluous to review in detail the many cases decided on the subject, but in the endeavor to bring the settled doctrine clearly to the mind, I refer to the most salient of the cases.

In *McCulloch* v. *Maryland* (1819), 4 Wheat. 316, and *Osborn* v. *Bank of the United States* (1824), 9 Wheat. 738, it was held that a State could not impose a tax on the operations of the Bank of the United States or any of its branches. In *Weston* v. *City Council of Charleston* (1829), 2 Pet. 449, *Bank of Commerce* v. *New York* (1862), 2 Black, 620, *Bank Tax Case* (1865), 2 Wall. 200, and *Banks* v. *Mayor* (1869), 7 Wall. 16, it was decided that a State was without power to tax stock or bonds issued by the United States for loans made to it, when held by an individual or by a corporation. In *Dobbins* v. *Commissioners of Erie County* (1842), 16 Pet. 435, it was decided that a State might not tax the compensation of an officer of the United States. And, in *Van Brocklin* v. *Tennessee* (1886), 117 U. S. 151, and cases cited on pages 167 *et seq.*, it was held that a State might not impose a tax on any property of the United States, including real estate of which the United States had become the owner as the result of a sale to enforce the payment of direct taxes previously levied by the United States.

Conversely, the adjudications concerning the want of power in the United States to tax the States are of a like scope. In *The Collector* v. *Day* (1870), 11 Wall. 113, 127, it was decided that Congress could not impose a tax upon the salary of a judicial officer of a State. In *United States* v. *Railroad Co.* (1872), 17 Wall. 322, it was held that the United States might not impose a tax upon the property and revenues of a municipal corporation. Two members of the court dissented (p. 334), on the ground "that the private property owned by a municipal corporation, and held merely as private property in a proprietary right, and used merely in a commercial sense for the income, gains, and profits," was "taxable just the same as

property owned by an individual, or any other corporation."
In *Van Brocklin* v. *Tennessee, supra,* where, as we have seen,
it was held that the State of Tennessee could not tax real
property within its borders while held by the United States
as proprietor, in reviewing the ruling made in *United States*
v. *Railroad Co.,* the court said (p. 178):

"This court, in *United States* v. *Railroad Co.,* 17 Wall. 322,
held that a municipal corporation within a State could not be
taxed by the United States on the dividends or interest of
stock or bonds held by it in a railroad or canal company, be-
cause the municipal corporation was a representative of the
State, created by the State to exercise a limited portion of its
powers of government, and therefore its revenues, like those
of the State itself, were not taxable by the United States.
The revenues thus adjudged to be exempt from Federal taxa-
tion were not themselves appropriated to any specific public
use, nor derived from property held by the State or by the
municipal corporation for any specific public use, but were
part of the general income of that corporation, held for the
public use in no other sense than all property and income,
belonging to it in its municipal character, must be so held.
The reasons for exempting all the property and income of a
State, or of a municipal corporation, which is a political di-
vision of the State, from Federal taxation, equally require the
exemption of all the property and income of the National
Government from state taxation."

In *Mercantile Bank* v. *New York* (1887), 121 U. S. 138, 162,
it was decided that the United States might not tax bonds
issued by a State or one of its municipal bodies under its au-
thority and held by private corporations.   In *Pollock* v. *Farm-
ers' Loan and Trust Company*—the income tax case—(1894),
157 U. S. 429, although much difference of opinion was mani-
fested in the court as to some of the questions involved, as to
one, that is, the lack of authority in the United States to in-
clude in the amount of income subject to taxation by the
United States money derived from interest on municipal bonds,

the court was unanimous. The opinion, in reviewing the subject and citing approvingly *The Collector* v. *Day, United States* v. *Railroad Co.*, the *Van Brocklin case* and the *Mercantile Bank case*, said (p. 584):

"As the States cannot tax the powers, the operations, or the property of the United States, nor the means which they employ to carry their powers into execution, so it has been held that the United States have no power under the Constitution to tax either the instrumentalities or the property of a State."

And, lastly, in *Ambrosini* v. *United States* (1902), 187 U. S. 1, it was held that Congress could not impose a stamp tax upon a bond which the state law required to be given as a prerequisite to the right to sell liquor.

Is the ruling now made reconcilable with the cases just referred to? In other words, is it consistent with the theory of the Constitution as interpreted from the beginning? In order to give the reasons which convince me that it is not, let me review the contentions which are relied upon to support the ruling.

1. It is urged that as the State of South Carolina derives revenue from the sale, by the agents of the State, of the liquor belonging to the State, therefore the United States has also the right to derive a revenue from that source. If by this contention it is intended to suggest that the South Carolina law was not passed in the exercise of the police power of that State, and must be treated as a revenue law from the mere fact that some revenue results from the operation of the law, the unsoundness of the proposition is demonstrated by the previous cases. In *Vandercook Co., No. 1, supra,* that identical proposition was urged, and was decided to be without merit; and the same doctrine was reiterated in the cases of *American Express Company* v. *Iowa*, 196 U. S. 133; *Adams Express Co.* v. *Iowa*, 196 U. S. 147, and *Pabst Brewing Co.* v. *Crenshaw*, 198 U. S. 17. If the contention be that wherever, by the exertion of state power upon persons or things, a revenue is produced,

there must be a corresponding right on the part of the Government of the United States to reap revenue by burdening the like person or thing, even although in so doing a state agency or instrumentality is taxed, the unsoundness of the proposition and its conflict with the previous cases becomes yet more apparent. One of the foundations upon which the doctrine rests, denying the power of the governments, State or National, to burden the instrumentalities or agencies of each other, is that if such burdening be permitted it might result in crippling the revenues of the Government, upon whose agency or instrumentality the tax was placed. Was this not the ground upon which the earlier cases were placed, and was it not specifically declared to be the foundation of the ruling made in the income tax case—*Pollock* v. *The Farmers' Loan & Trust Co., supra?* The contention that because one government may have derived income from the exertion of its authority, therefore the other government has a right to do likewise, even if the agencies of the other government be thereby taxed, reduces itself to this: That the power to burden arises from the very condition which prevents the power from existing. If pushed to its logical conclusion, the far-reaching result of the proposition that wherever revenue is derived from an act by one government, therefore the other may burden the agent or instrumentality of the other may be readily illustrated. Take the National Government. If in the exercise of its ample authority to establish national banks a tax is imposed on such banks and a revenue derived, do the States thereby become entitled, without the consent of Congress, to tax banks? Take the Post Office Department. If by the carrying of the mails revenue is derived by the Government of the United States, are the States from that fact entitled to tax the instrumentalities employed by the Post Office Department? Take the ocean transport service of the United States. If under given circumstances a charge is made for transportation, and hence a revenue is earned, may the States cripple that service by taxation? It is no answer to the dem-

onstration which results from these illustrations to say that the cases concern purely governmental functions of the United States, and, therefore, the States cannot tax the exercise of such functions. May I ask are these functions on the part of the United States any more governmental than is the power of the government of South Carolina to absolutely control at will the liquor traffic in that State?

2. It is implied that necessity demands the recognition of the right of the Government of the United States to tax the state agencies in question because the principle, by which alone such power on the part of the United States can be denied, will inevitably result in giving the States authority to destroy the Government of the United States by adopting peculiar methods of dealing with various classes of persons or property. Thus, it is said, the state governments may acquire all farms within their borders and thus deprive the United States of its power to impose a direct tax on land. That a State may import property from foreign countries and be exempt from import duty and undersell those who pay duty and render the collection of any import tax from others by the United States impossible. But these extreme illustrations amount simply to saying that it is possible for the imagination to foreshadow conditions which, did they arise, would impair the government created by the Constitution, and because such conjectures may be indulged in, the limitations created by the Constitution for the purpose of preserving both the state and National Governments are to be disregarded. In other words, that the government created by the Constitution must now be destroyed, because it is possible to suggest conditions which, if they arise, would in the future produce a like result. But the weakness of the illustrations as applied to this case is apparent. They have no relation to this case, since it is not denied that as to liquor the State has absolute power, and may prohibit the sale of all liquor, and thus prevent the United States from deriving revenue from that source. Again, therefore, when the true relation

of the argument to the case in hand is seen, it reduces itself to a complete contradiction, viz., a State may by prohibition prevent the United States from reaping revenue from the liquor traffic, but any other state regulation by which such result is accomplished may be prevented by the United States, because thereby the State has done indirectly only that which the State had the lawful power directly to do.

3. It is urged that the liquor in this case was owned by South Carolina, and in selling it the State was merely acting as a proprietor, and therefore the tax on the state agents is lawful. But here again the argument overlooks the absolute power possessed by the State concerning the liquor traffic, and the consequent right of the State in the exercise of its governmental functions to adopt such methods and instrumentalities as might be deemed best for the control of the traffic. Besides, the proposition is directly repugnant to the previous decisions of this court. Can anything be plainer than that the contention is directly antagonistic to the ruling made in *United States* v. *Railroad Co., supra,* which ruling was expressly approved in the subsequent cases, especially in the income tax case? Was not the United States the proprietor of the land in Tennessee, which it was held in the *Van Brocklin* case the State of Tennessee had no power to tax? Conceding, for the sake of argument only, that the doctrine announced in the previous cases should be qualified, certainly such qualification would be wholly unreasonable if it did not propose to take in view the absolute and paramount nature of the governmental function under which the property or agency which it was proposed to tax was held or exercised. Reference is made to cases in state courts concerning the liability of municipal corporations to suits for negligence. I cannot see their appositeness to the issue here involved. Besides, the doctrine expounded in the line of cases referred to, if doctrine can be deduced from the confusion and contradiction which exists among the cases, has never received the approval of this court. On the contrary, the rulings of this court point the other way.

*Barnes* v. *District of Columbia*, 91 U. S. 540; *Workman* v. *New York*, 179 U. S. 552, 574. But grant that the rule applied by some state courts, in order to determine when a municipal corporation may be sued for a negligent act, has relation to this case, my mind sees no possibility of holding that the State of South Carolina, when by the law in question it provided for the purchase and sale of liquor by its own agents, was not exercising a purely governmental function, in view of the absolute power of that State over that subject, and, moreover, in view of the act of Congress making such power complete and efficacious, even as to original packages of liquor before sale.

4. It is not, of course, by me denied that however varying may be the conditions to which the Constitution is applied, that instrument means to-day what it did at the time of its adoption; but I cannot give my assent to the doctrine that a limitation, which it has been decided over and over again arises from the very nature of the Constitution, is not to be enforced in a given condition to which the Constitution applies, because it does not appear that the framers could have contemplated that such conditions might be evolved in the course of the development of our constitutional institutions. To me it seems that no proposition could be more absolutely destructive of constitutional government.

Being of opinion that the State of South Carolina had complete and absolute power over the liquor traffic, and could exert, in dealing with that subject, such methods and instrumentalities as were deemed best, and that the United States was without authority to tax the agencies which the State called into being for the purpose of dealing with the liquor traffic, I, therefore, dissent, and am authorized to say that MR. JUSTICE PECKHAM and MR. JUSTICE McKENNA concur.