G. Ridgely Sappington, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 51944.   Promulgated April 30, 1932.

*William L. Marbury, Jr., Esq.*, and *D. H. Hamilton, Jr., Esq.*, for the petitioner.

*C. A. Ray, Esq.*, for the respondent.

By leave of the Board briefs were filed by *Sveinbjorn Johnson, Esq.*, on behalf of the University of Illinois, and *Robinson Brown, Esq.*, on behalf of the University of Alabama, as *amici curiae.*[1]

---

[1] A brief filed by the University of Illinois as *amicus curiae*, through Sveinbjorn Johnson, its counsel, was concurred in by Oscar E. Carlstrom, Attorney General of Illinois; John Fletcher, Attorney General of Iowa; Roland Boynton, Attorney General of Kansas; James W. Cammack, Attorney General of Kentucky; M. B. Halsfield, Assistant Attorney General of Kentucky; Henry N. Benson, Attorney General of Minnesota; George T. Mitchell, Attorney General of Mississippi; L. A. Foot, Attorney General of Montana; C. A. Sorensen, Attorney General of Nebraska; John J. Bennett, Jr., Attorney General of New York; James Morris, Attorney General of North Dakota; Gilbert Bettman, Attorney General of Ohio; James V. Allred, Attorney General of Texas. A further statement of concurrence therein was filed by U. S. Webb, Attorney General of California; Lawrence C. Jones, Attorney General of Vermont; Stuart & Stuart, counsel for Purdue University; and also by the Executive Committee of the Association of Land Grant Colleges and Universities, the University of Alabama, Alabama Polytechnic Institute, University of Arizona, University of Arkansas, the Regents of the University of California, University of Colorado, Connecticut Agricultural College, University of Delaware, University of Georgia, State College of Agriculture and Mechanic Arts, University of Hawaii, University of Kentucky, University of Maine, University of Mississippi, Mississippi Agricultural and Mechanical College, University of Montana, University of Nebraska, University of Nevada, University of New Mexico, University of North Carolina, University of North Dakota, North Dakota Agricultural College, Ohio University, Miami University, University of Oklahoma, Pennsylvania State College, University of South Carolina, Clemson Agricultural College, University of South Dakota, University of Tennessee, University of Texas, University of Utah, University of Virginia, University of Washington, University of Wyoming, West Virginia University.

OPINION.

GOODRICH: The compensation received by petitioner in 1928 for his services as a part-time instructor in the Law School of the University of Maryland must be included in his gross income for purposes of taxation under the provisions of section 22 of the Revenue Act of 1928 unless while rendering such services he was an officer or employee of the State of Maryland, or a political subdivision thereof,

engaged as an instrumentality or agent of the state in administering or executing an essential governmental function of the state; or, if an independent contractor, unless it further appears that a Federal tax upon his compensation substantially impairs his ability to discharge his duties and obligations to the state, or the ability of the state, or its subdivisions to procure the services of private individuals to aid them in their undertakings. *Collector* v. *Day*, 11 Wall. 113; *Auffnorat* v. *Hedden*, 137 U. S. 310; *United States* v. *Weitzel*, 246 U. S. 533; *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514; *Lucas* v. *Howard*, 280 U. S. 526; *Lucas* v. *Reed*, 281 U. S. 699; *Miller* v. *McCaughn*, 27 Fed. (2d) 128; *Blair* v. *Matthews*, 29 Fed. (2d) 892; *Blair* v. *Byers*, 35 Fed. (2d) 326; *Burnet* v. *Livezey*, 48 Fed. (2d) 159; *Elam* v. *Commissioner*, 45 Fed. (2d) 337; *Hugh Ogden*, 24 B. T. A. 1239. It is admitted that petitioner was not an officer of the state. The record discloses that the matter of a Federal tax upon his compensation was never discussed between petitioner and the officials of the Law School or the University, from which we may infer that there was no impairment of petitioner's ability to discharge his duties nor of the state's ability to contract for his services. Our task, then is to determine, (a) whether the University of Maryland and the Law School thereof are state institutions, integral parts of the state government; (b) whether these institutions are instrumentalities through which the state performs an essential governmental function; (c) whether petitioner, as an instructor in the Law School of the University, was an employee of the state engaged in administering or executing a governmental function of the state. A determination in the negative of any one of these propositions must result in holding subject to the tax the compensation here involved.

These identical issues were presented in the appeal of *Mary W. Niles, Executrix*, heretofore decided by this Board and reported in 20 B. T. A. 949. Niles was a part-time professor in the Law School of the University of Maryland. The appeal was brought by his executrix, and contested the right of the United States to subject to income tax the compensation received by him in the years 1925 and 1926 for his services so rendered. The Board decided that the compensation was subject to tax because the University of Maryland was a private eleemosynary corporation, not an instrumentality of the state; that in conducting the University no governmental function, essential or otherwise, was discharged, which by necessary implication was immune from such interference as Federal taxation of the salary of one of the professors of its Law School; and that Niles was not an official of the state.

In the case now at bar, the petitioner comes with the avowed purpose of presenting facts respecting the relation of the Univer-

sity to the state beyond those disclosed in the record previously considered. He comes to convince us that the University is a state institution, one of its governmental agencies wholly under its control; that its Law School is an integral part of the University, and also under state control; that in conducting the University and its Law School the state is discharging or performing an essential function of Government; and that petitioner, in his capacity of instructor in the Law School, is an employee of the University and of the state. He has succeeded in so doing. The record now before us discloses a relationship between the University, the state and this petitioner quite different from that which existed in the *Niles* case and quite different from that considered by the court in *Regents of the University of Maryland* v. *Williams*, 9 Gill. and J. (Md.) 365, upon which we relied.

It is true, as pointed out in our prior opinion, there is a distinction between " schools conducted by the state itself or by a political subdivision thereof such as a county, municipality or school district, on the one side, and a college or university, even though given the name of the state, conducted by a separate, private eleemosynary corporation on the other hand." The great weight of authority holds that, in conducting schools of the first class, the state or subdivision thereof is engaged in a governmental function. *School District* v. *Gage*, 30 Mich. 484; *Sullivan* v. *School District*, 191 N. W. 1020; *Anderson* v. *Board*, 190 N. W. 806; *Board* v. *McHenry*, 106 Ohio Statutes 357; 140 N. E. 169; *Kimare* v. *City*, 171 Ill. 332; *Hill* v. *Boston*, 122 Mass. 344; *State* v. *Frederick Co.*, 94 Md. 334; 51 Atl. 289.

It is true also, as further pointed out in the *Niles* case, that prior to 1920 the University of Maryland was an institution of the latter class. Though aided financially, it was not controlled by the state. It existed independently under its own charter, and its contractual status could not be impaired by legislative enactment. *Regents of the University of Maryland* v. *Williams, supra.* By statute in 1920 the Legislature of Maryland provided (chapter 480, Acts of 1920) for the consolidation of the old University of Maryland with the Maryland State College of Agriculture, then a state institution, to form a " new corporation " to be known as the University of Maryland. Section 6 of that act provided:

*And be it further enacted,* That this Act shall take effect on the first day of July, in the year 1920, provided that before that date, the Regents of the University of Maryland, as constituted under the Act passed at the November session, 1912 (1812), Chapter 159, as amended and supplemented, by the said Act passed at the January session, 1882, Chapter 88, *shall signify their assent thereto* by a resolution adopted by a meeting of said Regents, and by filing in the office of the Secretary of State of Maryland, a copy of such resolution of acceptance, certified by the hands of the Provost and of the Secretary of said

Board of Regents, and under its common and public seal, and shall be further accepted before said date by the Maryland State College of Agriculture, by a resolution adopted by its Board of Trustees, and by filing in the Office of the said Secretary of State of Maryland, a copy of such resolution of acceptance, certified by the hands of the President and Secretary of said Board, and under its seal, and upon the receipt of both of said resolutions, and not before, the Secretary of State shall issue a certificate that such resolutions of acceptance have been duly filed with him and such Certificate shall be evidence that the acceptances provided for in this Act have been duly given.

The assents required by section 6 were duly filed and the two institutions were consolidated into a new corporation exclusively under the administration and control of the state. Thus, *by its own volition*, the old University changed from a private to a public corporation. *By its own consent* it gave over to the state its identity, its properties, and its control. The fact that the corporation had assented to the merger or consolidation of itself with the Maryland State College of Agriculture to form a new institution, to be entirely under the ownership and control of the state, was not disclosed by the record before us in the *Niles* case, and that fact is essential to a determination of the status of the University as it exists today as a state institution. We think that, beyond doubt, when the old University assented to the proposed merger and filed public, official notice of that assent as required by the act, it did voluntarily what it could not have been forced to do by legislative fiat, namely, relinquished its status as an independent, self-governed, private corporation, and gave itself and its properties into the control of the state to become a public corporation.

The act of 1920 provided that the control, management and government of the consolidated institution and title to all properties of both the consolidated institutions should vest in the regents, who should exercise the powers already granted to the trustees of the Agriculture College, and also the powers possessed by the University regents under the old charter. The regents were to be chosen as provided in the act of 1916 respecting the board of trustees of the Agriculture College, namely, by appointment by the governor, by and with the advice and consent of the senate. The act of 1916 assigned to the board of trustees complete power of management, government and control of that institution, and subjected their management to the scrutiny of the legislature. To all these powers and to all the duties the regents of the consolidated institution succeeded.

By the Act of the General Assembly of 1922, chapter 29, the State Government of Maryland was reorganized into various executive and administrative departments, of which the fifth was " the State Board of Agriculture and the Regents of the University of Maryland." By

this act the Board of Regents was charged with the performance of many duties previously delegated to the Board of Agriculture. It also took over the functions of the State Board of Forestry, the State Geological and Economic Survey Commission, and the State Weather Service.

The act of 1922 further provides (ch. 29, p. 73, Bagby's Annotated Code of Maryland, art. 41, sec. 14) for an advisory council for the governor, composed of officers who are the heads of administrative departments of the state "for the purpose of promoting coordination, and effective supervision over the conduct of State Government." The president of the University, by authority of this statute, is a member of the governor's advisory council, which meets from time to time "for the consideration of general State policies, finances, departmental and institutional work and conditions." By statute also the Attorney General of Maryland is designated as legal advisor of the University. Prior to the consolidation in 1920, appropriations made by the legislature to the University were listed as "State aid institutions," as distinguished from those made to the College of Agriculture, listed as "departments, boards and commissions" or "State institutions." Since that time, however, appropriations to the University have been listed as "governmental appropriations," under the subtitle "public schools." It appears clear, therefore, that since 1920, the University of Maryland must be regarded as an administrative department of the Government of Maryland, a state institution, conducted, operated and governed by the state through its legally chosen representatives.

We think the fact that the Legislature of Maryland saw fit to create a new governing body to control the new state institution rather than assign its government to the already established State Board of Education is not determinative of the status of the institution, nor does it serve to create a distinction in law between the lower public schools and the public institutions devoted to higher and professional learning. The Board of Regents is as fully an instrumentality or department of the state as the General Board of Education. The fact that the state exercises control through the corporation does not divest it of its sovereign character. Cf. *Emergency Fleet Corporation* v. *Western Union*, 275 U. S. 415. Its creation served merely for greater convenience in exerting the state's sovereign power over the general field of education and we know of no limitation which may be imposed upon a state to control the number or form of the departments or agencies which it may create through which to exercise its powers. The fact that the old University was a private institution does not prevent it from becoming a public corporation, *Lewis* v. *Whittle*, 77 Va. 415, nor does the fact that tuition or other

fees are collected from its students make the University any less a state institution. *McLeod* v. *Lincoln Medical College*, 69 Nebr. 550; 96 N. W. 265. Incidents of the collection of costs or fees by the agencies of the state admittedly engaged in discharging the functions of the state government, such as a filing fee collected upon invoking the protection of the courts, or the fees of a justice of the peace, could be given in great number. The University is not operated for profit. Private individuals have no interest or control over it. Its property, its management and control are in the hands of the state and this has been recognized by the legislature by taking over such income as comes to the institution by way of tuition and other fees, and by making appropriations for the erection of buildings and to defray expenses. Control of and responsibility for the operation of the University by the state mark it as a public institution, and such institutions have generally been held to be instrumentalities or departments of the state. *Auditor General* v. *Regents of the University*, 83 Mich. 467; 47 N. W. 440; *University of Tennessee* v. *People's Bank*, 157 Tenn. 87; 6 S. W. (2d) 328; *Phillips* v. *Rector, etc. of University of Virginia*, 97 Va. 472; 34 S. E. 66; *State* v. *Regents of University*, 55 Kan. 389; 40 Pac. 656.

In the *Niles* case it was pointed out that the act of 1920 permitted the Regents, in their discretion, to permit any department, faculty, or school of the University to govern itself in whole or in part and to use available funds, including tuition fees, for its own purposes. The record before us does not disclose whether any department of the old University attempted to carry on its own existence nor if any did so for what period. It does disclose, however, that during the period here involved the Law School had no such separate existence, but was an integral part of the University governed by University officials and, through them, subject to state control, receiving state appropriations and remitting to the state all fees collected by it. In our opinion, therefore, this provision of the act is not determinative of the status of the Law School, at least during 1928. The Law School was merely a department of the University and as such was unquestionably a part of the administrative government of the state. Act 1920, ch. 480; *Spalding* v. *People*, 172 Ill. 40; 49 N. E. 993; *Foltz* v. *Hoge*, 54 Cal. 28; *People* v. *Kewen*, 69 Cal. 215; 10 Pac. 393; *Russell* v. *Trustees of Purdue University*, 201 Ind. 367; 168 N. E. 529.

But respondent contends that even though the University be held an instrumentality of the state, still petitioner is liable for the tax here imposed for the reason that in its conduct and operation the state was not exercising an essential governmental function. In support of his contention respondent cites the opinion of the United

States Customs Court in *University of Illinois* v. *United States*, Treasury Decision 43023 (vol. 54, No. 19), holding that education is, a proprietary, not a governmental function, and that at the time of the adoption of the Constitution education was a matter of private, not public concern, whose constitutional status can not later be changed.

We respectfully decline to be bound by this decision for it stands practically alone against the great weight of authority to the contrary. It must be recognized that state educational agencies lack those functions which generally distinguish public corporations which are classed as proprietary or fiscal from those which are essentially governmental in character. In its proprietary capacity the state or political subdivision has been considered as engaging in business, which is either operated for profit, cf. *South Carolina* v. *United States*, 199 U. S. 437; *Green* v. *Frazier*, 253 U. S. 233, or for the economic benefit of the local community, as in the operation of public utilities such as waterworks, electric light and power plants, and gas works, cf. *Omaha Water Co.* v. *Omaha*, 147 Fed. 1; *City and County of Denver* v. *Mountain States T. & T. Co.*, 76 Col. 225; 184 Pac. 604; *Wagner* v. *Rock Island*, 146 Ill. 139; 34 N. E. 546; *Denver* v. *Davis*, 86 Pac. 1027; *Blair* v. *Byers*, 35 Fed. (2d)˙ 326, where the acts and functions are those of management, control and public service, and not acts of public power, and are of local and not general public concern. The distinction between the two classes of powers as it arises in tort is well expressed by Mr. Justice Butler in *City of Trenton* v. *New Jersey* (1923), 262 U. S. 182, where he says:

It has been held that municipalities are not liable for such acts and omissions in the exercise of the police power, or in the performance of such municipal faculties as the erection and maintenance of a city hall and court house, the protection of the citys' inhabitants against disease and unsanitary conditions, the care of the sick, the operation of fire departments, the inspection of steam boilers, the promotion of education and the administration of public charities. On the other hand they have been held liable when such acts or omissions occur in the exercise of the power to build and maintain bridges, streets and highways, and waterworks, construct sewers, collect refuse and care for the dump when it is deposited. Recovery is denied where the act or omission occurs in the exercise of what are deemed to be governmental powers, and is permitted if it occurs in a proprietary capacity.

Proprietary functions have not been extended to public corporations by means of which the state carries out its educational policies. While such institutions may and do hold property, they hold it as a public trust and subject to the plenary control of the state government. This distinction has been recognized almost universally and

the authorities generally hold that the dissemination of education as carried out by state instrumentalities is not a proprietary but an essential governmental function of the state.

What a governmental function is depends not upon what was so considered at the time the Constitution was adopted, but upon the necessity of exercising the function today. Whether it is of general public concern is the criterion by which to determine what is a governmental function. Public needs vary with the changing conditions under which mankind finds itself. New scientific discoveries, new economic situations, new means of transportation, and increased complexity in social relations cause new governmental functions to become necessary to the welfare of society. Cf. *Group No. 1 Oil Corporation* v. *Bass*, 38 Fed. (2d) 680, 683.

When the danger from infectious and contagious diseases was discovered, methods for prevention and control of them, such as vaccination, quarantine, and inspection of milk and other foods, became public functions. It became necessary to have persons with scientific training to watch over the public health. The state began to place severe requirements upon doctors, nurses, and veterinarians and immediately facilities for training to meet these requirements became matters of public interest. When the citizen was given the ballot and so placed in control of government, a new need for the education of all persons was manifest. This need was met by establishing public schools which admittedly serve a public interest. It is obvious that law, engineering, teaching, pharmacy, and government, no less than medicine, require trained individuals if our modern complex society is to survive. In fact today there is as great a need of persons with wide training in these fields as there is in the rudiments of education. This has been recognized by France and Germany, who have placed all their universities upon a public basis; it has been recognized by the states in the establishment of state universities; and it has been recognized by the United States both in the aid it has given to state universities and in the high educational requirements it has demanded from public servants.

We disagree also with respondent's contention, supported by the Illinois case, that the field of higher education had not been occupied by the states at the time the Constitution was adopted. The Constitution was adopted in 1787. Long before that time the Massachusetts Colony expended public funds for the promotion of higher education and when, in 1780, it adopted its own constitution, it was provided (ch. 5, sec. 2) : " * * * it shall be the duty of legislatures and magistrates in all future periods of this Commonwealth, to

cherish the interests of literature and the sciences, and all seminaries of them especially the University of Cambridge, public schools and grammar schools in the town." In Connecticut, as early as 1715, public property and funds were applied to the advancement of college education at the institution which later was to become Yale University, and support was also contributed to the University of Cambridge, 11 C. J. 973. New Hampshire, in 1693 and again in 1719, provided for the support of education through taxation and its constitution of 1784 makes it the duty of legislators and magistrates " to cherish the interests of literature and the sciences and all seminaries and public schools." In 1764 Rhode Island adopted legislation providing for the incorporation of the schools and pertaining to secondary, as well as primary education. Kings College was founded by public act in New York in 1764 and in 1784 the Board of Regents of the University of the State of New York was created. In 1740 an appropriation was made by the city of Philadelphia for the support of an academy and Pennsylvania's constitution, adopted in 1776 (section 44), after providing for schools in every county, provides: " * * * and all useful learning shall be duly encouraged and promoted in one or more universities." A similar provision appears in the Constitution of North Carolina of 1776. Prior to the Revolution, Virginia had supported the College of William and Mary by means of grants of public land and public money. Vermont, in its constitution of 1777 provided " one grammar school in each county and one University in this State ought to be established by direction of the General Assembly." In 1782 a college at Chestertown was founded by the Legislature of Maryland and a permanent fund provided for the establishment of Washington College, thus showing that in Maryland also, before the Federal Constitution was adopted, higher education was regarded as a state function. See " Educational Legislation and Administration of the Colonial Government," by E. W. Clews. In view of the foregoing it can not be denied that before the Constitution was adopted the several Colonies had recognized that the maintenance and operation of schools of both elementary and higher grade at public expense was a proper function of Government. Moreover, a review of Congressional policy from the Ordinance of 1787, through the various land grant acts beginning in 1826 to the Purnell Act of 1925, discloses that the Federal Government has always regarded education as a proper and essential governmental function of the states and has repeatedly appropriated Federal properties and funds for the support of state educational institutions.

Nor can it be denied that the carrying out of the educational policies of the state, whether with respect to elementary or higher education, is an operation of the state "essential to the execution of its governmental functions, and which the state can only do itself" (*Flint* v. *Stone Tracy Co.*, 220 U. S. 107). The process of discharging its duty to educate its citizens is an essential function of state government, carried out equally through the operation of primary and secondary schools. *Gillespie* v. *Oklahoma*, 257 U. S. 501; *Group # 1 Oil Corporation* v. *Bass*, 283 U. S. 279; *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393.

While it is true that a state may, if it so elects, rely upon the efforts of individuals and private corporations to supply its citizens with the facilities for either primary or higher education, whether it shall do so or not is a matter of discretion on its own part and may not here be questioned.

With respect to the relation between the state and this petitioner, we conclude that, in his capacity as instructor in the Law School, he was an employee of the state. In serving as an instructor, he was not undertaking the ordinary duties of a lawyer, serving the state as he would another client. He was not free to exercise his full discretion in the discharge of his duties to the school. He was instructed as to what he should do, when he should do it, and how he should report the results of his efforts as reflected by the progress of his students. He was subject to the supervision, direction and control of the state, through its administrative officers, even though his own experience, skill and application to his duties made it unnecessary for them to interfere with the conduct of his courses. He was paid by the state from state funds. The state listed him as one of its employees, a classification which finds support in numerous decisions of state courts defining the status of persons in positions similar to that occupied by petitioner, although usually employed upon a full-time basis; *Steinson* v. *Board of Education*, 165 N. Y. 431; 59 N. E. 300; *Wiley* v. *Board of Education*, 225 Mich. 237; 196 N. W. 417; *Hartigan* v. *Board of Regents of W. Va. University*, 49 W. Va. 14; 38 S. E. 698; cf. *Burnet* v. *Livezy*, 48 Fed. (2d) 159.

Measured by the tests laid in the several decisions first cited in this opinion, after considering all the facts before us, we hold that petitioner is an employee of the state of Maryland and engaged in carrying out, as an instrumentality of the state, an essential administrative function of the state government. As such, his compensation is not subject to Federal tax.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

McMahon, concurring: The correct result has been reached in this proceeding.

However, the majority opinion contains the following, to which I can not agree:

What a governmental function is depends not upon what was so considered at the time the Constitution was adopted, but upon the necessity of exercising the function today. Whether it is of general public concern is the criterion by which to determine what is a governmental function. Public needs vary with the changing conditions under which mankind finds itself. New scientific discoveries, new economic situations, new means of transportation, and increased complexity in social relations cause new governmental functions to become necessary to the welfare of society. Cf. *Group No. 1 Oil Corporation* v. *Bass*, 38 Fed. (2d) 680, 683.

The language which supports this view will be found at page 684 of the opinion in that case, which is the opinion of the District Court of the United States for the Western District of Texas. However, the Circuit Court of Appeals, Fifth Circuit, reversed the District Court (41 Fed. (2d) 483), and the Supreme Court of the United States affirmed the Circuit Court (283 U. S. 279). Neither the Circuit Court nor the Supreme Court approved the language used by the District Court.

The language used by the District Court is contrary to that of the United States Supreme Court in *South Carolina* v. *United States*, 199 U. S. 437, 456, which is in part as follows:

\* \* \* The exemption of the State's property and its functions from Federal taxation is implied from the dual character of our Federal system and the necessity of preserving the State in all its efficiency. In order to determine to what extent that implication will go *we must turn to the condition of things at the time the Constitution was framed*. What, in the light of that condition, did the framers of the convention intend should be exempt? [Italics ours.]

I am aware that there is some support for what the District Court said in *Group No. 1 Oil Corporation* v. *Bass*, *supra*, and for what is said in the opinion of the majority of the Board, in the opinion of Chief Justice Winslow, speaking for a majority of the court in *Borgnis* v. *Falk Co.*, 133 N. W. (Wis.) 209, 215–216, which however, does not involve the question of an essential governmental function, the question involved in the instant proceeding and in *South Carolina* v. *United States, supra*.

What is said in the concurring opinions of Justices Barnes and Marshall in *Borgnis* v. *Falk Co.*, *supra*, is supported by the case of *South Carolina* v. *United States, supra*.

I quote from the concurring opinion of Justice Barnes (pp. 222–3), as follows:

I concur in the opinion of the Chief Justice, except in so far as it is said in effect that our Constitutions may mean one thing to-day and something different to-morrow, depending on whether conditions and ideals have in the

meantime undergone a change. I regard our Constitutions as immutable, except when changed in the manner therein prescribed. * * * To hold otherwise is to say that the courts may change our fundamental laws. This would be a clear usurpation of power, never vested nor intended to be vested in the courts, and one which was reserved to the people themselves. * * * I do not share the belief that our Constitutions have become archaic, or that they have outlived their usefulness. * * *

I quote also from the concurring opinion of Justice Marshall (pp. 223, 225) as follows:

* * * The fertile method of dealing with the Constitution has been characterized as one which has "furnished a mode of argument which would on the one hand leave the Constitution crippled and inanimate, or on the other give it an extent of elasticity subversive of all rational boundaries." Story, Constitution, 389.

&ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

If the Constitution is to efficiently endure, the idea that it is capable of being resquared, from time to time, to fit new legislative or judicial notions of necessities in praesenti, instead of new legislation being tested by it, must be combated whenever and wherever advanced, and wrong impressions in regard to the matter carefully guarded against. To even, significantly, speak of making the Constitution adaptable to new conditions by means of interpretation, when the selection of new and constitutional means, adaptable to such conditions, is meant, is liable to confuse and weaken that high regard all should have for the fundamental law as a broad, definite, certain, comprehensive, unvarying and unvariable system, other than by the means therein pointed out. Dark will be the day, if that day will ever come, for the people of this country, and dark to the people of all countries whose attention is directed here for lessons in constitutional government, when our system shall not be held up by the courts as speaking the same at one time as at another, except in so far as changes shall be made in the particular way. That is the doctrine of *Marbury* v. *Madison*, 1 Cranch, 137, 2 L. Ed. 60. No one can read that great exposition of our system without appreciating how illogical it is to speak of interpretation as an instrumentality for giving, from time to time, a different cast to the fundamental law. * * *

What Justices Barnes and Marshall said applies with equal, if not greater, force to the question as to what an essential governmental function is, which is involved in this proceeding.

To say that a " governmental function" " depends not upon what was so considered at the time * * * the Constitution was adopted " and that present " general public concern is the criterion by which to determine what is a governmental function," is to disregard our Constitution.

For a discussion of what is meant by essential governmental function and a distinction between that and public use and public purpose, see *T. P. Wittschen*, 25 B. T. A. 46.

Furthermore, the reasoning of the majority opinion, set forth in the foregoing quotation, is unnecessary to sustain the result reached in this proceeding, since it appears clearly from that opinion that education was considered to be an essential governmental function

at the time of the adoption of the Federal Constitution. This brings this proceeding within the language quoted from *South Carolina* v. *United States*, *supra*.

In the light of the foregoing discussion, I address myself further to the question as to whether petitioner was engaged in the performance of an essential governmental function.

In *Vestal* v. *Pickering*, 267 Pac. (Oreg.) 821, at p. 823, it is stated by the Supreme Court of Oregon: " It must be conceded that under our form of government the conduct of the public schools is a governmental function."

The real question before us is as to whether the governmental function in question in this proceeding is an essential one.

In *Veazie Bank* v. *Fenno*, 8 Wall. 533, it is stated:

\* \* \* that the reserved rights of the states, such as the right to pass laws, to give effect to laws through executive action, to administer justice through the courts, *and to employ all necessary agencies for legitimate purposes of state government are not proper subjects of the taxing power of Congress.* [Italics ours.]

In *Trustees of Dartmouth College* v. *Woodward*, decided in 1819, 17 U. S. 517, at p. 632, the Supreme Court of the United States, speaking through Chief Justice Marshall, used this significant language:

That education is an object of national concern, and a proper subject of legislation, all admit. That there may be an institution, *founded by government*, and placed *entirely* under its *immediate* control, the officers of which would be public officers, *amenable exclusively to government*, none will deny. [Italics ours.]

Apparently, this was said in response to the argument of counsel for the defendant in error in that case at p. 600, as follows:

The education of youth, and the *encouragement of the arts and sciences*, is one of the *most important* objects of civil government. Vattel lib. 1, c. 11, Sections 112–13. [Italics ours.]

An argument of similar import, but more elaborate, is found in the following excerpt from the brief filed in this proceeding by counsel for the University of Illinois as amica curiae and concurred in by the Attorneys General of Illinois, Iowa, Kansas, Kentucky, Minnesota, Mississippi, Montana, Nebraska, New York, North Dakota, Ohio, and Texas:

\* \* \* general enlightenment is one of the first conditions of permanent and successful democratic government. Education everywhere concerns the state; but in a republic, where all ultimate power rests in the citizen, expressing his will through the instrumentality of a secret ballot, it is simply impossible to overestimate the importance of his bringing to the task of casting his ballot a large measure of cultivated intelligence and correct information. Ignorance and indifference are the two arch enemies of free institutions. Both can be routed if our public school system fulfills its promise. \* \* \*

This is a compelling reason for the conclusion that the education by a state of the citizens of a state is an essential governmental function.

As stated in *South Carolina* v. *United States, supra*, at p. 448:

* * * We have in this Republic a dual system of government, National and state, each operating within the same territory and upon the same persons; and yet working without collision, because their functions are different. There are certain matters over which the National Government has absolute control and no action of the State can interfere therewith, and there are others in which the State is supreme, and in respect to them the National Government is powerless. To preserve the even balance between these two governments and hold each in its separate sphere is the peculiar duty of all courts—preeminently of this—a duty oftentimes of great delicacy and difficulty.

Thus, to the extent that there is reserved to the state, under the Federal Constitution, *control* over the subject of education, the state is supreme and " the National Government is powerless." That there is reserved to the State of Maryland the power to do what it did upon the subject of education, as appears from the facts in this proceeding, is not questioned here and can not be successfully challenged.

Since the state, like the Federal Government, is supreme, each within its sphere, as pointed out by the United States Supreme Court, it follows irresistibly that each state must have reasonable latitude in the exercise of its powers, functions and duties and also similar latitude in determining what governmental functions are essential and when and how and by whom and by what instrumentalities they will be performed, subject to such limitations as those pointed out in *Pierce* v. *Society of the Sisters*, 268 U. S. 510, which have no application here. Otherwise, what is said by the United States Supreme Court in the above quotation would have little, if any, meaning.

Furthermore, the Federal Government should accord very great respect to a state when a state is acting within its sphere; and should not disturb such action of the state unless clearly not well founded. Cf. *Jones* v. *Portland*, 245 U. S. 217, and *Fall Brook Irrigation District* v. *Bradley*, 164 U. S. 112.

In *Jones* v. *Portland* the United States Supreme Court said (p. 221):

The act in question has the sanction of the legislative branch of the state government, the body primarily invested with authority to determine what laws are *required in the public interest.* [Italics ours.]

In *Fall Brook Irrigation District* v. *Bradley*, 164 U. S. 112, the United States Supreme Court said (p. 160):

For these reasons, while not regarding the matter as concluded by these various declarations and acts and decisions of the people and legislature and

courts of California, we yet, in the consideration of the subject, *accord to and treat them with very great respect*, and we regard the decisions as embodying the deliberate judgment and matured thought of the courts of that State on this question. [Italics ours.]

While each of these cases deals with the question of a public use, I see no reason why the reasoning in them should not apply with equal, if not greater force, to the exercise by a state of an essential governmental function, such as is involved in this proceeding.

It is obvious from the facts in this proceeding that the State of Maryland determined that the education offered by the University of Maryland and its law school was essential. Among other things, it levied taxes and used funds derived therefrom for the maintenance and operation of such university and law school. It can not be said that in these respects it has exceeded that reasonable latitude to which it is entitled in the performance of its essential governmental functions.