## Wanless Iron Company, Petitioner, v. Commissioner of Internal Revenue, Respondent.

Docket Nos. 46385, 49626, 63450.   Promulgated January 23, 1934.

*Paul E. Shorb, Esq.*, for the petitioner.

*James K. Polk, Esq.*, and *Harold F. Noneman, Esq.*, for the respondent.

840

**OPINION.**

McMahon: The petitioner contends that it and the leases involved herein are governmental instrumentalities or agencies of the State of Minnesota for the development and operation of its school lands, dedicated to the support of its public schools; and that therefore it is immune from Federal taxation.

It has been held that in maintaining its public schools a state is exercising a "function strictly governmental in character." *Burnet* v. *Coronado Oil & Gas Co.*, 285 U.S. 123. To the same effect is *G. Ridgely Sappington*, 25 B.T.A. 1385.

The Supreme Court of the United States has prescribed tests and imposed limitations which must be applied in dealing with the doctrine of immunity as invoked by the petitioner. To be immune from Federal taxation, the agency or instrumentality of the state must be one through which the state *immediately* and *directly* exercises its *sovereign* powers; and must be *intimately* connected with the *necessary functions* of the government of the state. *Metcalf & Eddy* v. *Mitchell*, 269 U.S. 514. The application of this doctrine must be *practical* and have regard to the *circumstances* disclosed. *Burnet* v. *Jergins Trust*, 288 U.S. 508. It must be given such a practical construction "as will not *unduly* impair the taxing power of the one or the appropriate exercise of its functions by the other." *Susquehanna Co.* v. *Tax Comm.* (*No. 1*), 283 U.S. 291, 294. The agency or instrumentality of the state is not immune from Federal taxation unless it is shown affirmatively by the party having the burden of proof (in these proceedings the petitioner) that the tax will impose a *substantial, direct burden* upon the state. If the influence of the tax is *remote* there is no immunity. This principle of immunity from Federal taxation of the instrumentalities of the state "has its *inherent* limitations." *Fox Film Corp.* v. *Doyal*, 286 U.S. 123; *Willcuts* v. *Bunn*, 282 U.S. 216. In *Burnet* v. *Coronado Oil & Gas Co.*, *supra*, relied upon by petitioner, adhering to the rule approved in *Gillespie* v. *Oklahoma*, 257 U.S. 501, also relied upon by petitioner, the Supreme Court said:

We are disposed to apply the doctrine of *Gillespie* v. *Oklahoma strictly and only in circumstances closely analogous to those which it disclosed.* [Emphasis ours.]

An analysis of all of the facts, and more particularly the circumstances and relationships, disclosed in these proceedings, and a full appreciation of just what happened here, leads to the conclusion that the petitioner has not met any of these tests or brought itself within these limitations.

The State of Minnesota leased to Wanless mineral lands of which the state is still the owner. Wanless assigned the leases to petitioner, and, subject to subsequent subleases, the petitioner ever since has been the owner of these leases. Petitioner subleased to Butler Brothers and others some of the lands. One of these subleases was assigned by the sublessee to another assignee and subsequently was by this assignee released back to the petitioner by deed. Neither Wanless, the lessee and assignor, nor petitioner, the assignee and sublessor, ever extracted or sold ore from the lands. The sublessees are

the only ones that produced and sold ore. Neither Wanless nor these sublessees are before us. Presumably, the ore that was produced by the sublessees was sold to others, fifth parties in the sequence of events which led to the realization of funds from the mined ore with which to pay the state its royalty of 25 cents per ton, which was the most that the state got for its ore and which was what the state was primarily interested in. In any event this 25-cent royalty was paid directly to the state by the sublessees. Petitioner paid no royalty to the state. This 25-cent royalty did not pass through petitioner to the state or appear on petitioner's books of account or enter into its gross income. Petitioner produced and sold no ore. The capital, labor, skill, and other things required to produce and sell the ore and to realize and pay the royalty of 25 cents per ton belonging to the state was supplied by the sublessees; not by petitioner. The sublessees thus produced the income to the petitioner as a result of their operation of the mines and sale of the ore. Petitioner was merely the conduit through which the right or privilege of mining the ore and the resulting obligation of paying this royalty to the state were passed on from Wanless, the lessee and assignor, to sublessees. These could all have gone directly from Wanless to the sublessees without the intervention of the petitioner. Petitioner was not essential to the realization by the state of its 25-cent royalty.

Without owning the ore deposits which belonged to the state and without doing anything about the actual production and sale of the ore and the actual payment of the royalty to the state, petitioner received from the sublessees, after the payment of the 25 cents per ton royalty to the state by the sublessees and the payment of taxes by them, a liberal overriding royalty or profit, which, as to some tonnage, was not less than 50 cents per ton on each ton of ore for which the state, which owned the ore deposits, received only 25 cents per ton of royalty or not more than half as much. The principal consideration for its 25-cent royalty moving from the state was the ore in place. No such consideration moved from the petitioner for what it received. As detailed in our findings of fact, the subleases proved to be very profitable to the petitioner. This is well illustrated by the following ultimate figures. As of March 1, 1913, the aggregate total fair market value of petitioner's interest or equity in the mineral lands covered by its subleases, being the then present worth of its expected future royalty receipts after operation, based on the unmined reserves of ore and the lives of the mines, was $627,978.26; and as of May 4, 1921, petitioner's admitted assets were augmented by a similar value in the amount of $103,828, based on additional ore discovered on that date in the land covered by one of the subleases.

From 1913 to 1929, inclusive, there were extracted from not more than 240 acres covered by the subleases, by the sublessees, or by them and the assignee of one of them, a total of 3,227,541 tons of ore, on which the state's royalty of 25 cents per ton totals $806,885.25. The total tonnage for the one year of 1926 was 401,577 tons and the state's royalty thereon totals $100,393.25. The tonnage for 1927, 1928, and 1929, the only years before us, was 766,950 tons and the state's royalty thereon totals $191,737.50. The petitioner's total receipts for these three years from its sublessees, based on such tonnage, was $306,875.27, or an average of $102,291.76 per year. The Federal income tax for these three years, as shown by the stipulated deficiencies and the alleged refunds sought, cannot exceed $6,242.75 per year, on the average, or less than 6 percent of these receipts. Its total disbursements for these three years were $14,173.91, or an average of $4,724.63 per year. Its other disbursements in those years consisted only of other taxes, office and miscellaneous expenses, and rent paid to the State of Minnesota. This item of rent is small and there is no explanation as to what it covered.

Obviously, the sublessees produced the ore in such volume to sell it at a profit and found the extraction and sale of the ore profitable, after paying the 25 cents per ton to the state, the taxes required of them and the overriding royalties or profits to the petitioner. Otherwise, the sublessees would not have produced such a large volume of ore. Each sublease was either terminated or, at the election of the sublessees, terminable.

It is likewise obvious that those who purchased the ore from the sublessees, adequate provision having been made by lien and otherwise for the payment of the 25 cents per ton royalty to the state out of the proceeds of the sales by the sublessees, made profits resulting from such purchases. Otherwise, they would not have purchased such a large volume of ore from the sublessees. It is unnecessary for the purposes of this proceeding to trace any further the ore or the source of the 25-cent royalty which accrued to the state, or to pursue further this line of reasoning. We are concerned in these respects only with the question as to whether the receipts of the petitioner derived from the operations of the sublessees after the payments of this royalty and taxes by the sublessees are subject to taxation under Federal law, or, in other words, whether they are immune from such taxation.

All of the large amount of ore tabulated in our findings of fact was produced and the large amount of state royalties thereon accrued to the state upon the assumption, apparently, that the income of the petitioner therefrom was taxable under Federal law. It reported income therefrom for 1927, 1928, and 1929 and paid taxes thereon.

The petitioner, at one time, by stipulation before the Board, consented to the determination of deficiencies based on such income. From the record it appears that it was not until after the decision in *Burnet* v. *Coronado Oil & Gas Co.*, *supra*, was rendered that the petitioner questioned the imposition of such Federal income tax on the ground that it was not subject to such taxation.

There is no evidence that the state actually has been or will be unable to realize its royalty of 25 cents per ton on any of its ore covered by the subleases involved in these proceedings as a result of imposing a Federal income tax upon the income derived by the petitioner from the sublessees. No offer of evidence of this character was made.

In the leases from the state to Wanless we find the following provisions:

* * * The party of the second part [Wanless] agrees to pay all taxes, general or specific, upon the land so leased, which may be assessed either against said land and the improvements thereon, or the iron ore produce thereof, or any personal property at said mines, during the continuance of this lease; *just the same as though the lands herein leased were owned in fee by the said party of the second part;* * * *

The covenants, terms and conditions of this lease shall run with the land and be in all respects binding and operative upon all sub-lessees and guarantees under the party of the second part. * * *

The party of the first part reserves, and shall at all times have, possess and hold a lien upon all *ore mined*, * * * for any unpaid balances due on this contract. [Emphasis ours.]

A similar tax provision was before the Supreme Court of Minnesota in *Fryberger* v. *Inland Steel Co.*, 218 N.W. 553. The court in its opinion states:

* * * As indicated in the Marble case, [*Marble* v. *Oliver Mining Co.* (Minn.), 215 N.W. 71] the purpose of the parties to Minnesota mineral leases and assignments thereof ordinarily has been to pass on, from lessor to lessee and from lessee to sublessee, *the entire tax burden, whatever form it may take.* In solving such a problem of interpretation, the effort must always be to get into and understand the situation of the parties at the time. * * * *The possibility of taxes additional in burden and new in variety was plainly foreseen.* Hence we find even in the state lease a general assumption of " all taxes general and specific, which may be assessed against said land."

*The purpose of that tax assumption clause was made as far reaching and inclusive as could be.* It was to put the lessee in the position, with respect to *all* [printed in italics] taxes, of an owner in fee. *The state did not purpose to permit its lessee to participate in nor derive any benefit from the immunity of its own property from taxation.* Subletting or assignment by the lessee was contemplated and is quite usual. *With respect to the incidence of taxes on* the leasehold, the lessee was to be dealt with as an owner in fee. So any tax on the resulting interest of Crosby in the demised land was covered by his agreement, in the lease, to pay all taxes, general of specific, the same as though he had been the owner in fee instead of lessee.

* * * * * * *

\* \* \* *And although the lease from the state may not itself be the source of the lessee's obligation to pay a royalty tax on increased royalties gotten by him through an assignment, it is in a very real sense because of the lease and because he is lessee that he has to pay them; that is,* the duty to pay the tax is one which rests upon the lessee as such. That is enough for present purposes because *the assignment from Crosby to defendant put upon the latter the duty to pay all taxes imposed upon the "lessee therein," there being nothing to require also that the obligation to pay be imposed by the lease itself rather than some law. It is enough to make that covenant applicable that the tax is put upon the leasehold or something appurtenant to or carved out of it so that it becomes a duty of the lessee to pay it.* [Emphasis ours.]

See also *Fraser* v. *Vermillion Mining Co.*, 221 N.W. 13; and *State ex rel. Oliver Mining Co.* v. *Armson*, 232 N.W. 35.

As thus construed by the Supreme Court of Minnesota this is a sweeping tax provision designed to deny immunity from any tax burden, in any form, *as if the state did not own the land or the iron ore product thereof.* The denial of immunity applies to a "*tax put upon the leasehold or something appurtenant to or carved out of it.*" All "*benefit from the immunity of its own property from taxation*" is with respect to "*all taxes*" thus denied by the state. [Emphasis ours.]

The position of the state as manifested by this provision is that immunity from taxation is not necessary to the extraction and sale of its ore and the realization of its 25-cent royalty. In fixing the royalty at the figure of 25 cents per ton the state, no doubt, took into consideration that immunity from all taxation was thus denied. In any event the state must have been satisfied from its experience, of which it apparently had considerable, that immunity such as that which petitioner is here seeking is not necessary to the realization of its royalty of 25 cents per ton on its ore; and Wanless, the petitioner, the sublessees, and the purchasers of ore from the sublessees did what they did, with the results to the state heretofore pointed out, notwithstanding this denial by the state of immunity from taxation, which is carried through to and binding upon all of them. None of them was deterred by this express sweeping denial of immunity imposed by the state. The provisions of the lease put them on notice as to this denial of immunity by the state.

A sovereign may by its own action voluntarily thus consent to the taxation of its governmental agencies and instrumentalities by another sovereign and thereby waive immunity from such taxation. *Mid-Northern Oil Co.* v. *Walker*, 268 U.S. 45. The Mid-Northern Oil Co. engaged in producing oil from lands in Montana leased by the United States under the Federal Oil and Gas Leasing Law. Under the laws of Montana every person engaged in producing petroleum or other mineral or crude oil within the state was required

to pay to the state annually a license tax equal to 1 per centum of the gross value of the oil so produced during the year. The Mid-Northern Oil Co. challenged such state taxation. The act of Congress pursuant to which the lease was made contained a provision as follows:

That nothing in this Act shall be construed or held to affect the rights of the States or other local authority to exercise any right which they may have, including the right to levy and collect taxes upon improvements, output of mines, or other rights, property, or assets of any lessee of the United States.

The United States Supreme Court, in holding that the Mid-Northern Oil Co. was not immune from the state taxation which it challenged, stated:

The more natural view, and the one we adopt, is that Congress, having provided for leasing the public lands to private corporations and persons whose property, income, business and occupations ordinarily were subject to state taxation, meant by the proviso to say in effect that, although the act deals with the letting of public lands and the relations of the government to the lessees thereof, nothing in it shall be so construed as to affect the right of the states, in respect of such private persons and corporations, to levy and collect taxes as though the government were not concerned. In other words, the purpose of Congress was to remove altogether from the field of controversy, among other questions, the very question which is here presented, and to put beyond doubt the authority of the states to impose taxes upon lessees in respect of their property, although arising from, and in respect of their taxable rights, although exercised under, the act, without regard to the origin thereof or to the interest of the United States in the lands or lease.

It seems to us, therefore, that in view of the provision in the state leases to the effect that the lessee shall pay all taxes just the same as though he owned the land leased, which ran with the land, the decisions of the Supreme Court of Minnesota construing the same, and the doctrine of this *Mid-Northern Oil Co.* case, the state has denied to the petitioner and thereby waived by consent immunity from Federal income taxation in so far as the petitioner, the assignee and sublessor under these school land leases are concerned. *Bass* v. *Group No. 1 Oil Corp.*, 41 Fed. (2d) 483, and cases cited. (Affirmed at 283 U.S. 279, on other grounds.)

It is true that the denial of immunity in the *Mid-Northern Oil Co.* case is embodied in a statutory provision, while in the instant proceeding it is embodied in a lease or contract; but this lease or contract is not only authorized by statute, but, as to this provision, it is prescribed by statute. In other words, it is founded upon a statutory provision. Here, as well as there, the action of the sovereign is competent to accomplish its manifest purpose. We see no sound basis for a distinction on this ground. Too, neither the validity nor full force and effect of this provision of the lease or contract has been challenged in any way.

What was stated by the court as follows in *Willcuts* v. *Bunn, supra,* applies with equal force to the instant proceeding:

It must be remembered that *we are dealing, not with any express constitutional restriction, but only with an asserted implication.* The constitutional provisions authorizing the Congress to lay taxes (article 1, §8; Sixteenth Amendment) are certainly broad enough to cover the tax in question, and before we can restrict their application upon the ground of a burden cast upon the State's borrowing, where *the tax is not laid upon the contracts made* by the State in the exercise of that power, *or upon the amounts payable thereunder, but is laid upon the result of distinct transactions by private owners, it must clearly appear that a substantial burden upon the borrowing power of the State would actually be imposed.* But we have nothing but assertion and conjecture. [Emphasis ours.]

The Sixteenth Amendment is as follows:

The Congress shall have power to lay and collect *taxes on incomes, from whatever source derived,* without apportionment among the several States, and without regard to any census or enumeration. [Emphasis ours.]

This amendment was ratified by the Legislature of the State of Minnesota on June 12, 1912.

In section 22 (a) of the Revenue Act of 1928, gross income is defined as follows:

(a) *General definition.*—" Gross income " includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever.

A similar definition is to be found in section 213 (a) of the Revenue Act of 1926.

The petitioner's claim of immunity from Federal taxation is not founded upon any express constitutional or statutory provision, but upon the doctrine or principle of *implied immunity. Collector* v. *Day,* 11 Wall. 133; *Pollack* v. *Farmers' Loan & Trust Co.,* 157 U.S. 584; *South Carolina* v. *United States,* 199 U.S. 437; *Metcalf & Eddy* v. *Mitchell, supra; Willcuts* v. *Bunn, supra; Indian Motocycle Co.* v. *United States,* 283 U.S. 570; *Burnet* v. *Coronado Oil & Gas Co., supra; Burnet* v. *Jergins Trust, supra; T.P. Wittschen,* 25 B.T.A. 46.

Any doubt that may arise about the application of an *implied* Federal constitutional provision to a factual situation, such as we have here, as against the application to such factual situation of an *express, comprehensive* Federal constitutional provision and *comprehensive* legislation enacted pursuant thereto, must be resolved against the application of the implication. We have no such doubt here however.

The United States Supreme Court has also held that profits on the sale of bonds of municipal corporations, governmental instrumentalities (*Pollack* v. *Farmers' Loan & Trust Co.*, 157 U.S. 429, 584), constitute "gains, profits and income" from sales or dealings in property within section 213, Revenue Act of 1924, and hence are taxable. *Willcuts* v. *Bunn, supra.* In this case the Court said:

But it does not follow because a tax on the interest payable on state and municipal bonds is a tax on the bonds and therefore forbidden, that the Congress cannot impose a nondiscriminatory excise tax upon the profits derived from the sale of such bonds. *The sale of the bonds by their owners, after they have been issued by the States or municipality, is a transaction distinct from the contracts made by the government in the bonds themselves, and the profits on such sales are in a different category of income from that of the interest payable on the bonds.* * * * *The tax upon interest* is levied upon the return which comes to the owner of the security according to the provisions of the obligation and *without any further transaction on his part.* The tax falls upon the *owner by virtue of the mere fact of ownership, regardless of use or disposition of the security. The tax upon profits made upon purchases and sales is an excise upon the result of the combination of several factors, including capital investment and, quite generally, some measure of sagacity; the gain may be regarded as "the creation of capital, industry and skill."* *Tax Commissioner* v. *Putnam*, 227 Mass. 522, 531, 116 N.E. 904, 910, L.R.A. 1917 F. 806.

\*          \*          \*          \*          \*          \*          \*

* * * If the tax now in question is to be condemned, it must be because of practical consequences and not because purchases and sales by private owners of state and municipal bonds are a part of the State's action in borrowing money. It would be far-fetched to say that such purchases and sales are instrumentalities of the State. *They are not transactions made directly or indirectly in behalf of the State or in the course of the performance of any duty of the State.* Sales are merely methods of transferring title to the obligation, that is, the right to receive performance of the promise of the State or municipality. [Emphasis ours.]

A question somewhat similar to that decided in *Willcuts* v. *Bunn, supra*, was passed upon by the Court of Claims of the United States in *Marland* v. *United States*, 3 Fed. Supp. 611, such question being as follows: Whether the profits derived by the plaintiff from the sale of a number of oil and gas leases of certain school lands entered into between him and the State of Oklahoma were immune from Federal income taxation; and the court in holding such profits taxable said:

The immunity from taxation applies only where the tax would be a real and direct burden upon the State's exercise of its governmental functions and it is our opinion that under the cases cited the burden upon the State of Oklahoma in leasing its public lands on the best possible terms, because of the tax that may be exacted from the lessee upon the sale by him of his leases from the State, is so indirect and remote as to place it outside the principle that one Government may not levy a tax upon the functions or instrumentalities of another. Although it is shown in this case that a lessee

of oil lands from the State of Oklahoma would pay more to the State for a lease in the first instance, if he were assured that profits from the sale of a lease would be exempt from Federal income tax, this was doubtless true in *Group No. 1 Oil Corp.* v. *Bass, supra.* [283 U.S. 279.]

\* \* \* A gain derived by a taxpayer through *a sale of property or interest therein acquired from a state*, whether acquired in the form of *a lease or by purchase*, does not, in our opinion, fall within the implied constitutional prohibition against taxation. "The immunity does not extend to anything lying outside or beyond governmental functions and their exercise \* \* \* ." *Indian Motorcycle Co.* v. *United States, supra.* \* \* \* and it is apparent that not everyone who uses his property or derives a profit, as a result of his dealings with the government, may clothe himself with *immunity from taxation. Metcalf & Eddy* v. *Mitchell, supra.* [Emphasis ours.]

In *Rice Oil Co.* v. *United States,* — Fed. Supp. — (Sept. 8, 1933), the District Court of the United States for Montana there was presented another somewhat similar question: Whether an assignee of oil and gas leases procured from the State of Montana, lessor, is taxable under Federal income tax law upon income derived in part at least from proceeds of the sale of oil taken from the lands covered by the leases and used in part payment, at least, for the assignment; and in holding such income taxable the court said:

It appears from the complaint that plaintiff sold its interest in the lands on September 10th, 1926, to the Marine Corporation for $3,000,000.00. $1,000,000.00 was paid in cash and $2,000,000.00 were to be paid out of production of oil from the lands included in the lease. By the terms of the contract governing this transaction title was to pass to the purchaser as of August 11th, 1926. Therefore, can it be said that the income in question was derived by plaintiff as a lessee of the lands or was it in the nature of a profit upon the sale of a capital investment at a price above cost; in view of the facts here, the latter would seem to afford the correct answer under *Marland* v. *United States*, 53 F. (2d) 907; and *Willcuts* v. *Bunn*, 282 U.S. 216.

As appears from our findings Wanless assigned both state leases to petitioner for one dollar and all of its capital stock of the par value of $50,000. Under the doctrines of the three cases last discussed, can there be any question about the taxability under the Federal income tax laws of profits, if any, made by Wanless on the sale of this stock? While this issue is not before us, we think not. If Wanless is thus taxable, why should not the petitioner be taxable on the income in question here? In reality Wanless bunched the leases in question and sold them for a consideration to petitioner; and if a profit be made by him on his disposition of that consideration, it is taxable. Instead of bunching these leases and selling them to one buyer, petitioner carved out of each leasehold which it bought one or more subleaseholds and sold each for a consideration consisting for the most part in each instance of cash for each ton of ore mined—under one sublease for cash in the amount of 50 cents for each ton of ore mined. The effect in principle is the same as if it made but one sublease to one sublessee. The principal thing which

passed to each sublessee under its sublease from petitioner was petitioner's interest in the ore as conveyed by the subleases; among other things, its right or privilege of mining each ton of ore. The only consideration which actually passed from the sublessee to petitioner was the stipulated amount per ton which it reserved, subject to the qualifications imposed by the sublease, including, among others, the qualification that the state be first paid its royalty of 25 cents per ton, which was protected by its lien. Why should not the profits made by the petitioner on the considerations which it received on its sales or other dispositions to the sublessees be likewise taxable? We conclude that it should be under the principles of these three cases, without indulging in extended refinements as to the instruments of conveyance or agreements involved there or here.

The nature of these Minnesota mineral leases is shown by what the supreme court of that state said in *Marble* v. *Oliver Mining Co.*, 215 N.W. 71, as follows:

Mining leases, as a rule, cover a long term of years. They aim at the exhaustion of the ore, the real value of the land. When that has been accomplished, the premises are left in a shape utterly unfit for the ordinary uses of land. The situation of the parties at the time of this letting was that both contemplated that the mining would wholly deplete the ore; that *the only returns to the lessor for the supposed great value of the land because of the mineral deposit therein would be the royalty;* that *the lessee would assume all the burdens and expenses* connected with the mining, and *realize all the profits which improved methods in mining and advance in price of the product might give over and above the royalty and taxes.* For the lessee, the undertaking was a great speculation. [Emphasis ours.]

In *Fryberger* v. *Inland Steel Co., supra*, the Minnesota Supreme Court also said:

The lease gave Crosby the right to assign or sublet; that is, it created the right out of the exercise of which (by the assignment to defendant) *has sprung the reserved interest*, the right to the additional royalty from defendant, which has become the subject of the royalty tax. The lease put in him an estate upon his ownership of which as lessee has been put his additional royalty. It is not a mere excrescence due to any unnatural or unexpected development. [Emphasis ours.]

The position of Wanless is similar to that of Crosby and that of petitioner similar to that of this defendant. But in the instant proceedings petitioner took another step. It sublet to the sublessees, thereby parting with a portion of what it got from Wanless, reserving to itself certain overriding royalties or profits, which as to some tonnage was 50 cents per ton, as heretofore pointed out, which constitute a consideration moving to it for the subleases and which are the subject of the tax sought by the respondent here.

The petitioner claims that by the assignment by Wanless it stepped into the shoes of the assignor and that whatever immunity

from taxation, if any, attached to the original lessee must, of course, under the circumstances disclosed, have passed to the petitioner as assignee. It regards itself as the lessee of the lessor state on the assumption that the assignment terminated the relationship between the state and Wanless as lessor and lessee created by the original lease.

After the assignment of the state leases by Wanless to the petitioner, there still remained the privity of contract between the state and Wanless created by the state leases, which was not affected by the assignment. Although made with the assent of the lessor, the lessee still continues liable on his covenants by virtue of this privity of contract. Thompson on Real Property, vol. 2, p. 498; *Oswald* v. *Fratenburgh*, 36 Minn. 270; 31 N.W. 173.

While the petitioner, subject to the subleases, is the owner by assignment of such leases, it did not become the owner thereof through the action of the state or in the exercise of its sovereign power. The state was not a party to the assignment or subleases. It was stipulated by the parties that:

The school lands covered by the leases aforesaid from the State of Minnesota have never been sold by the State and the aforesaid leases upon it have ever since their issuance always been and now are in full force and effect.

While the approval of the Land Commissioner of Minnesota is endorsed on the assignment of the state leases to the petitioner, there is no evidence that such approval was other than an approval of form and execution. However, even if such approval may be construed to be a consent of the State of Minnesota to such assignment, it can not be regarded as a new leasing so as to terminate the original leases and to relieve Wanless of his obligations as lessee thereunder. See *Keegan* v. *Heilman Brewing Co.*, 129 Minn. 496; 152 N.W. 878; and *Rees* v. *Lowry*, 57 Minn. 381; 59 N.W. 310, wherein it is held that in no sense is an assignment of a lease and assent thereto to be regarded as a new leasing. In *Wilcox* v. *Hedwell*, 239 N.W. 763, wherein a lessor sued his lessee, who had assigned the lease, for arrears of rent and taxes, the court states:

The lease contains no restrictions on assignment of the leasehold. Nothing is better settled than that a surrender of a lease, or release of a lessee, is not to be implied from the mere facts that the lessor has assented to an assignment and accepted rent from the assignee. *Stern* v. *Thayer*, 56 Minn. 93, 57 N.W. 329; *Hilzinger, Jr.* v. *Novak*, 172 Minn. 369, 215 N.W. 515. So it is not enough for defendant that plaintiffs knew of the several assignments and accepted rents from the assignees. * * * The intention is plain that the defendant might assign, and that, if he did, the normal course would be for the assignee to pay rent directly to the lessors. That was to the defendant's interest and what he wanted. Not only is there no evidence of an agreement on the part of plaintiffs to surrender, but every consideration of good business was against it because of defendant's financial responsibility.

The case of *Indian Territory Illumination Oil Co.* v. *Oklahoma,* 240 U.S. 522, cited by the petitioner as supporting its contention that as assignee of the state lessee it is immune from Federal taxation, is distinguishable. The Court states the question before it for determination in the following language:

\* \* \* whether a certain assignment of a lease and rights thereunder made by the Osage Tribe of Indians, \* \* \* are subject to a tax assessed under the Laws of Oklahoma as the property of \* \* \* [the oil company] in its capacity of a public service corporation.

While it appears that the original lease was made by Oklahoma with one Foster, and Foster assigned the lease to the oil company, it also appears, as stated by the Court in its opinion, that:

The Act of 1905 recognized the oil company as the owner by assignment of the lease, which assignment was approved by the Secretary of the Interior, and extended the lease for a period of ten years from March 16, 1906, with all the conditions of the original lease except that from and after that date the royalty to be paid on gas should be $100 per annum on each gas well instead of $50, as provided in the lease, and except that the President of the United States should determine the amount of royalty to be paid at all.

From the above it clearly appears that there was in fact a new leasing. Furthermore, in that case the assessment was made upon the leases as objects of taxation having no immunity under Federal law.

Conceding that the state leases are governmental agencies, under the doctrine of *Gillespie* v. *Oklahoma, supra,* and *Burnet* v. *Coronado Oil & Gas Co., supra,* did Wanless execute the assignment as agent of the state in its behalf and for its benefit? Certainly not. He was acting for himself as principal and for his own benefit. A lessee in no way becomes the agent of the lessor by virtue of a lease agreement. When Wanless assigned the leases he did so at his own risk, for he remained liable on his contract with the state and the state could look to him for the performance of his covenants. While Wanless acquired all of the petitioner's capital stock, he and the petitioner are two separate and distinct entities. *Eisner* v. *Macomber,* 252 U.S. 189; *Burnet* v. *Commonwealth Imp. Co.,* 287 U.S. 415; and *Burnet* v. *Clark,* 287 U.S. 410. Nor was the petitioner acting in behalf of the state or for its benefit when it subleased the premises. When it subleased the premises it likewise did so at its own risk and not as the agent of the state.

The state is not a party to the subleases or the assignments to petitioner, and hence these subleases are not instrumentalities of the state. A state must be a party to its own instrumentalities in a situation of this character. It is a party to the leases and they are its instrumentalities. But assignments followed by subleases, to none of which it is a party, have intervened. The contracts between Wanless and petitioner and between petitioner and the sublessees are

different contracts from the one between Wanless and the state, which is the only one to which the state is a party.

From the foregoing discussion it appears that these proceedings do not disclose " *circumstances closely analogous* to those which " are disclosed in *Gillespie* v. *Oklahoma, supra,* or *Burnet* v. *Coronado Oil & Gas Co., supra,* the doctrine of which we are required by the latter case to " *apply * * * strictly.*" In the *Coronado* case the taxpayer was a party with the state to the lease. As *lessee* the taxpayer supplied the capital, labor, skill, and other things necessary to extract the oil and gas from the land. The taxpayer and the state shared the oil and gas extracted by the lessee, equally as to some, and in the proportions of one eighth to the state and seven eighths to the taxpayer, as to some. The state received for the lease a consideration in kind from the lessee. (*Mid-Northern Oil Co.* v. *Walker* (Mont.), 211 Pac. 353, 356; affirmed in *Mid-Northern Oil Co.* v. *Walker, supra.*) This was in the nature of a profit-sharing arrangement. The state supplied the oil and gas in place. The state derived school funds from the sale of its share of the oil and gas extracted by the lessee. The taxpayer likewise derived the income sought to be taxed from its share of such oil and gas. The United States Supreme Court held that this income of the taxpayer was immune from Federal income taxation solely upon the ground that the lease was the *instrumentality* of the state through which it *immediately* and *directly* exercised its sovereign power, adhering *strictly* to the doctrine of the *Gillespie* case. The *circumstances* disclosed in that case are closely *analogous* to those of the *Coronado* case. It is plain from an examination of those cases and more recent cases of the United States Supreme Court heretofore pointed out (*Fox Film Corp.* v. *Doyal, supra,* and *Burnet* v. *Jergins Trust, supra*), that to carry this doctrine of implied immunity beyond the requirements of those cases as contended for by petitioner in these proceedings would be contrary to those cases.

It follows, therefore, that since the petitioner is not an agency through which the state *immediately* and *directly* exercised its sovereign powers, since petitioner is not *intimately* connected with the *necessary functions* of the state, since the subleases and not the state leases are the source of the petitioner's income here involved, since no *direct and substantial burden* is laid upon the power of the state to lease its school lands, since the effect of the imposition of Federal taxation on the petitioner's income herein on the state or its revenue is *remote* and at best merely conjectural, and since the granting of the immunity sought would *unduly impair* the taxing power of the Federal Government, the determination of the respondent that such income is subject to Federal income tax is approved.

The respondent contends also that the right of the petitioner to the receipts of royalty from its sublessees, or so-called overriding royalties constituting its income involved herein, was valued by the respondent, which value was determined to be the value of petitioner's interest as of March 1, 1913; that in arriving at this value the entire amounts of the expected future receipts from the sublessees under the contracts were discounted to reach the value on the basic date and represent exactly what a willing buyer would have then paid a willing seller for the right to receive the entire future royalties; that this gross value of the petitioner's interest was in fact the gross gain from the contracts; that the statutory depletion deduction spreads this gross value of petitioner's expected future receipts over the number of tons of ore actually mined; and that therefore this deduction for depletion in fact exempts from tax the entire value of the consideration provided in the contracts to be paid to the petitioner by its sublessees. In view of our conclusion as to respondent's first contention, hereinbefore stated, it is not necessary to discuss this second contention of the respondent.

Reviewed by the Board.

*Decision will be entered for the respondent.*

STERNHAGEN, MURDOCK, and MATTHEWS concur in the result.
LANSDON dissents.